## No. 2497.

## J. M. DRAKE *v.* THE STATE.

1. GRAND JURY—INDICTMENT.—The motion to quash the indictment in this case was based upon the ground that it was presented by an illegal grand jury. The objection urged to the grand jury was that, although a legal body as impaneled, it was dissolved by the discharge of one of its members who had removed beyond the jurisdiction of the court and acquired a domicile in another State, before this indictment was presented; and that the eleven persons remaining on the panel did not constitute such a grand jury as was competent to present a legal indictment. *Held* that the motion to quash was properly overruled. The legality of the grand jury could not be affected by the absence of one of its members. See the opinion in extenso for an elaborate discussion of the question.

2. INDICTMENT—VARIANCE.—The indictment alleged the name of the deceased to be *L. S.* Guinn. The proof showed it to be *S. L.* Guinn. *Quære:* Was the variance between the allegation and the proof material? Note that, without deciding the question, the opinion suggests that, inasmuch as a new trial must be had because of other errors, a new indictment should be returned.

3. MURDER—EVIDENCE—DYING DECLARATIONS.—If a dying declaration was reduced to writing when made, it is not competent for the prosecution to prove it by parol without accounting for the non-production of the writing. The effect of this rule can not be avoided by the statement

of the witness that the declaration as a whole was first made orally to him by the deceased, and that he then immediately reduced it to writing, and the deceased signed the writing. In other words, the declararation having been reduced to writing by the witness immediately after it was made by the deceased, and then signed by the deceased, the writing can not be ignored and the testimony of the witness be applied to the narrative of the deceased immediately before it was reduced to writing. See the opinion on the question.

4. SAME.—As part of the predicate upon which the dying declarations of deceased were admitted, a witness was allowed to testify that the deceased, just before his death, called for his written statement, and that either the original writing or a newspaper copy of the same was produced and read to him, and that in reply to the question whether or not it was correct, the deceased said that it was substantially correct, but that there were some immaterial alterations he would like to make, but was too weak to do so; which alterations were never made. *Held* that, in view of this testimony, the proof of the dying declarations was erroneously admitted. The rule is that "if it appears that the declarations were intended by the dying person to be connected with and qualified by other statements material to the completeness of the narrative, and that this was prevented by interruption or death, so that the narrative was left incomplete and partial, the evidence is inadmissible."

5. SAME—CHARGE OF THE COURT.—A witness for the defense having denied on his cross examination that he made certain statements about the homicide, after the homicide was committed, the State introduced four witnesses who testified that the said witness did make the statements imputed to him. *Held,* that the testimony of the four State's witnesses was impeaching and not criminative evidence, and that the failure of the trial court to properly limit it by the charge was error.

APPEAL from the District Court of McLennan. Tried below before the Hon. Eugene Williams.

The death penalty was assessed against the appellant upon his conviction in the first degree for the murder of L. S. Guinn, in McLennan county, Texas, on the twenty-seventh day of August, 1887.

Miss Edna Guinn was the first witness for the State. She testified that she was the daughter of the deceased and was eight years old. She was with her father, standing at his side, on the back porch of the house, when he was shot. Deceased was sweeping the porch, and had the broom in his hand when he was shot. Defendant came to the house and demanded of deceased the payment of rent. Deceased replied that defendant had treated him so meanly that he would not pay the rent. Defendant thereupon called deceased an "old fool" and shot him. De-

ceased fled from the porch through the house, and thence across the street to Mr. Brightwell's house. Deceased was on the porch when shot, and defendant was on the ground. Witness did not know where the deceased was when defendant came into the back yard.

Cross examined, the witness said that the deceased went to the Drake house, where the shooting occurred, on the fatal morning, before she and her sister went. Witness's sister and brother were on the premises at the time of the shooting. When witness reached the house she saw that deceased had some pictures on the front gallery. Defendant was then in the front yard, but was not then talking to the deceased. There was no quarrel on the front gallery between defendant and deceased, nor did deceased have a hatchet in his hand at that time. Defendant remained in the front yard but a short time when he went around the house into the back yard. Witness went to the back gallery, and presently the deceased came to that gallery through the house, sweeping out some papers and trash. Defendant was then in the back yard, and spoke before deceased did. Deceased told defendant that he was no gentleman, but witness heard no cursing done before the shooting. Deceased did not have a hatchet in his hand when he was shot. Witness did not know what he had then done with the hatchet. Witness did not recollect that when he was shot the deceased slammed the broom on the floor. Defendant was not more than four or five feet distant from deceased when he fired. Witness saw nobody pass the house while defendant and deceased were in the back yard.

Rev. V. G. Cunningham testified, for the State, that he was at his house, near the Drake house, when the deceased was shot. He heard the report of the pistol, and within a minute he saw deceased going from the Drake house to Mr. Brightwell's house. Witness went to deceased, overtaking him in the middle of the street, between the Brightwell and Drake houses, and asked him: "My dear brother, what is the matter?" Deceased replied: "Drake has shot me, and shot me for nothing." He then said that he was suffering greatly; that Drake came to him while he was sweeping and asked him to pay his rent; that he told Drake that he had treated him so badly that he did not think he owed him, Drake, anything for rent, and that defendant then shot him.

Cross examined, the witness said that deceased did not say that he had or had not a hatchet in his hand when he was shot;

he said nothing about slamming a broom down when he was shot; he said nothing about cursing defendant, nor did he say that he did not owe the defendant any rent. Deceased's name was S. L. Guinn.

Doctor J. C. J. King testified, for the State, that he knew the deceased, whose name was S. L. Guinn. He was generally known as Professor Guinn. Witness was called to attend him professionally, and reached him about a half or three-quarters of an hour after he was shot. He found deceased suffering from a gun shot wound through the body, the ball entering the right breast about two inches above the nipple, and passing entirely through. His condition was extreme, but he was clear of mind and impressed with the belief that he would die. In reply to deceased's question, the witness told him that the wound was dangerous and would probably prove fatal. Deceased appeared to realize the nature of his danger. When the nervous shock to the system wore off, deceased became somewhat hopeful, but within a day or two became satisfied that he would die. What the deceased said in the nature of dying declarations was said in answer to questions propounded by the witness and others who were then standing around. Deceased was then conscious, mentally sound, and absolutely certain that he was going to die. A number of questions were asked of the deceased while he was lying wounded at the Brightwell house; to each of which he replied. First, he was asked where he was when he was shot? He replied that he was on the back gallery of the house he had rented from Drake. He was then asked where Drake was when he fired the shot? He replied that Drake was on the ground in the back yard. He was then asked what was the cause of the shooting. He replied that Drake shot him without provocation. He was then asked what he was doing when Drake shot him. He replied that he was sweeping off the back gallery, preparing to surrender the house to Drake. After making the statements set out, the same were reduced to writing, were read over to deceased, and he signed and swore to them as thus written down before justice of the peace Sleeper. A short while before his death the deceased called for his written declaration. Either the original writing or a newspaper copy of the same was produced and read to him, and he was asked if it was correct. He replied that it was substantially correct, but that there were some immaterial alterations he would like to make, but that he was

too weak to make them; and they were not made. Deceased died on or about August 27, 1887.

J. W. Brightwell testified, for the State, that in August, 1887, he lived at the corner of Sixth and Cleveland streets, in the city of Waco, in the house opposite the Drake house in which the deceased was then living. Witness did not know whether the initials of the deceased were L. S. or S. L. Witness was absent from home when the deceased was shot, but reached his house thirty or forty minutes later. On his arrival at home he found the deceased at his said house, about sixty feet distant from the Drake house, very badly wounded. The Drake house in which deceased lived, and on the back gallery of which he was said to have received his death wound, contained five rooms; two of those rooms being built east and west, and two built to those so as to form a "T" with a shed room attached. About fifteen minutes after he got home the witness went to the Drake house, on the back gallery of which he found a pile of dirt and papers. They appeared to have been swept there, but the witness had no recollection of seeing a broom about there. He also found a bullet hole in the wall back of the dirt pile, and saw the place where a bullet struck the wall on the back gallery. A hatchet, with the handle pointing out, was lying on the mantel piece in the front room, on the end of the mantel piece next to Sixth street. There was no door leading direct from that front room to the back gallery. A short time after he was shot deceased remarked to witness that it was hard for a man, shot as he was, to get well. He talked to witness a short time before his death, and then appeared to be sane. Witness saw a difficulty between the defendant and the deceased on the second day before the shooting. It occurred in front of the drug store of Castles & Morrison, on Austin street. The witness was on the opposite side of the street from the drug store, looking for the deceased. He saw defendant and deceased walking up the street until they reached a point in front of the drug store, where they stopped and entered into conversation. Witness, seeing they were engaged, stepped off a few feet to wait. He soon discovered that they were angry, and were likely to become embroiled in a difficulty. He next saw the deceased hand a paper to the defendant, who accepted it with the remark: "I will take it." Deceased then grabbed at defendant, and defendant put his hand in his pocket remarking: "I am catching up with a thief, and that is why I intend to keep this paper." Thereupon the witness

stepped forward and prevented the deceased from striking the defendant. Deceased was then standing with his back to the street, and defendant was standing near him. As deceased turned to look up the street, defendant struck him on the cheek, and the two clinched. They fought for a few minutes, the deceased evidently getting the best of the fight, he being much the larger and stronger of the two men. Sheriff Harris and other parties soon arrived upon the scene and separated the combatants.

Cross examined, the witness stated that both men, while engaged in the row on Austin street, used very rough language. Witness did not hear deceased call the defendant a son of a bitch, but thought he called him a bitch before he, defendant, struck deceased the first blow. Deceased was a strong man, weighing about one hundred and seventy-five pounds. Defendant was quite a small man, weighing not more than one hundred and twenty pounds. Witness did not hear Drake tell deceased that the reason he kept the receipt was that deceased did not give him the note he had promised. Deceased commenced moving from the Drake house on Friday, the day before the shooting, and moved all of his household effects, except about two dray loads, on that day.

Starke West testified, for the State, that he saw the difficulty between the defendant and the deceased which occurred on Austin street, about five o'clock p. m. on the second day before the shooting. Witness was on horseback at the corner of the street, and had his attention attracted by the angry manner of the parties. One of them said that the other was not acting right about a paper. They were separated, and when deceased turned his head the defendant struck him a blow on the jaw. Deceased then struck defendant on the side of the head and backed him off. Deceased was a larger and more powerful man than the defendant, and outmatched him. Both men were evidently very angry.

W. M. Sleeper was the next witness for the State. He testified that the deceased was one of the faculty of the Waco university, and was genera ly known as Professor Guinn. Witness was a justice of the peace, and as such officer he went to Mr. Brightwell's house after the deceased was shot, to take his dying declaration. The doctors warned deceased, in the witness's presence, that he was going to die, and that the statement he would then make would be his dying declaration. Witness was

satisfied that deceased was then conscious of his condition, and was satisfied that he would die. He was in full possession of his mental faculties, and was apparently sane. Witness sat on the side of the bed occupied by the deceased, and heard his statement. He then went to a table and wrote down the statements as made by deceased. He then took the writing back to the bed and read it over to deceased, and the deceased signed it. Witness took that paper to his office and kept it there until a day or two before the deceased died, when somebody (witness could not remember who) came to the office and got the writing to show it to deceased, since when witness had not seen it, and could not say what had become of it. He had made unsuccessful search for it since. Deceased completed his oral statement to witness before witness wrote it down. Witness then, and at once went to a table and wrote it down from memory, then took it back to the bed and read it to deceased, and deceased signed it. Witness could not remember whether or not deceased said that the writing was true or not. In substance, deceased's oral statement to witness was that he had fallen behind in the payment of rent to the defendant; that defendant got to pushing him for payment, and he reminded defendant of his promise not to press him; that he began to move from the house on the evening preceeding the shooting, and that defendant came to and remained about the place during most of the time that he was moving; "that Drake came there again on the next morning and went to the back of the house with his two little boys, and while he, Guinn, was at the back of the house Drake demanded the rent of him, and he told Drake that on account of his treatment he did not think he owed Drake anything at all, and Drake then shot him." He said nothing about having a hatchet. Witness held the inquest over the body of the deceased. The testimony taken at that inquest gave the name of the deceased as L. S. Guinn. Having examined the testimony adduced on the inquest, witness said that he was mistaken in his last statement. It appears that wherever the deceased's name appears in the body of that instrument as L. S. Guinn, the L. S. has been erased and S. L. substituted. (The defense objected to this evidence about the oral statement of deceased.)

Cross examined, the witness stated that deceased said nothing in his dying declaration about a quarrel between himself and defendant on the front gallery a few minutes before the shooting, nor that he then had a hatchet in his hand. He said noth-

ing about going to the back part of the house after defendant started to leave. He said nothing about a promissory note he had promised to give Drake. He said nothing about telling defendant that he was no gentleman, nor did he say anything about his difficulty with defendant in town. He said nothing about Drake taking Sam Hall to the house on the evening before the shooting, for the purpose of renting the said house to Hall. He said nothing that witness could remember, about taking down some pictures on the morning of the shooting.

Mrs. Brightwell, who lived with her husband in the house opposite the Drake house, was the next witness for the State. She testified that she was at the Drake house, then occupied by the deceased, on the evening before the shooting. While there, she saw both the defendant and the deceased. Deceased was moving his book case, and defendant was talking to Mr. and Mrs. Hall in one of the rooms. It was the witness's recollection that deceased then had some pictures on the floor. Drake remained at the house about three hours, and left just before dark. Witness saw Drake at the house on the next morning before the shooting, which occurred at about ten o'clock. Witness had been to the house, and when she left, the deceased was in the room facing Cleveland street, collecting papers with his hands and feet. Defendant was then on the front gallery. Before she left, the witness saw a hatchet on the mantle piece in the northwest room, on the end next to Sixth street. She saw that hatchet immediately before she left. About fifteen minutes after the witness got home, deceased sent to her to borrow a broom, and she sent one to him. Edna, the daughter of the deceased, was with the deceased when witness first saw him after he was shot. That was when they were crossing the street from the Drake house to witness's house. Witness saw two small boys with defendant, but, as she took no special notice of them, she would not know them again.

Cross examined, the witness said that she went to the Drake house at about half-past one o'clock on the day before the shooting, and remained until about half-past six, and was there when Hall came. She went back about eight o'clock on the next morning, and left at about twenty-five minutes before ten. Deceased came to the house that morning at about nine o'clock, at which time defendant was standing on the front steps. She did not see defendant on the front gallery, nor did she see the deceased have a hatchet in his hands on that morning. When

witness left, deceased was on the back gallery. Witness did not see deceased have a broom on that morning. Defendant and the two boys entered the yard on that morning at the front gate.

Sam Hall testified, for the State, that he and his wife went to the Drake house, on Sixth street, on the evening before the shooting, and saw deceased and the hands that were moving his furniture. Drake came to the house after witness reached it. Witness and his wife went to look at the house with the view of renting it. When he went home he left Drake at the house.

On his cross examination, the witness said that he saw deceased moving out of the house early in the afternoon, and concluded then that if he and Drake could agree upon terms he would rent the house. He then went to see Drake, told him that deceased was moving out of the house, asked him the price at which he rented it, and said that he would look at it and perhaps rent it. It was about sun down when Drake reached the house. When witness and his wife went home they left Drake and his two small boys and deceased and the men moving him, at the house. The witness did not rent the house, because Drake, upon the plea that he had lost too much by the failure of deceased to pay him, refused to make some repairs he required. Witness had no agreement with Drake to meet him at the house. After the shooting of deceased the witness went to the house and saw a hatchet on the mantel piece in one of the rooms, and a broom on the back gallery near a trash pile.

A. Smith, a drayman, testified, for the State, that he hauled the last of deceased's household goods, save a few articles, from the Drake house, leaving there between nine and ten o'clock on the morning of the shooting. Defendant was at the house when witness left. Witness saw no boys with him.

George W. Keys testified, for the State, that he witnessed the difficulty between defendant and deceased on Austin street, a day or two before the shooting. He saw deceased hand defendant a paper, which the defendant put in his pocket. When deceased turned his head defendant struck him. Deceased then turned and struck defendant on the side of the head and knocked him nearly to the wall—the parties then being on the sidewalk. Witness knew that both defendant and deceased used rough language, but could not recall what they said. Witness heard of the shooting a day or two later.

Mrs. McMay testified, for the State, that she was a sister of the deceased. The name of the deceased was Samuel LaFayette Guinn. He was called LaFayette in early life, and was never called Samuel. He signed his name S. L. Guinn.

Mrs. Wallace testified, for the State, that she lived in the house in the lot next to the Drake place. She saw the deceased sweeping off the front gallery about fifteen minutes before the fatal shot was fired. She saw, at the same time, a man of low stature in the back yard. She did not know the man, but afterwards learned that he was the man who shot deceased. She heard the shot, but did not know where it was fired, as she was inside of her house when it was fired.

S. L. Norwood testified, for the State, that defendant was in his office in Waco on the evening before the shooting. He had a receipt which he had obtained from deceased. He said that he was going to the house on the next morning to see deceased, and that if he did not get rent he would get something else.

On his cross examination, the witness said that nobody but himself and defendant were in the office at the time of this conversation, which occurred some time in the afternoon. Witness was busy, and paid but little attention to defendant. Defendant said nothing about notes. Witness had always found defendant a gentleman.

Ed Rotan testified, for the State, that he was the foreman of the grand jury which presented the indictment against the defendant. That indictment was found upon the record of the testimony as taken at the coroner's inquest. Deceased was described in that indictment as L. S. Guinn, as the name appeared in the written testimony before the inquest. That writing shows that the name was written L. S. Guinn in the caption, but that L. S. had been changed to S. L. in the body of the same. The witness Rotan testified that William Edmonds was impaneled as a member of the grand jury, and was present when the testimony was read, and voted on the finding of the bill, but left before the indictment was presented.

M. B. Davis testified, for the State, that he was city editor of the Waco Examiner, newspaper, when the shooting of the deceased occurred, and wrote up the tragedy for the columns of that paper. He inquired of two or three of the friends of the deceased and was told by them that the latter's name was L. S. Guinn. He got that information from Mr. Cunningham and Professor Franklin, of Baylor University. A copy of the Ex-

aminer containing the account of the killing referred to was here shown the witness. He stated that deceased's name appeared as S. L. Guinn in that account. It was nevertheless his belief that he wrote the name L. S. Guinn, and that the proof reader changed the initials after finding out that the correct name was S. L. Guinn.

The State closed.

Sheriff W. T. Harris testified, for the defense, that he saw the difficulty between defendant and deceased on Austin street a few days before the shooting, but recollected but little of the particulars, more than that they had a fight. Deceased was much the larger and more powerful man of the two.

F. M. Makeig testified, for the defense, that defendant, a day or two before the shooting, came into his office when he observed the injury to his ear, and remarked to him: "Guinn gave you a good one on the ear." Defendant laughed and replied: "Yes, he did." This witness and A. Hinchman, Charles Rast, A. J. Caruthers, G. B. Gerald, W. M. Flournoy, J. B. Gilmer, Henry Warren and N. W. Battle testified that they had known defendant for a number of years, and that his reputation had always been that of a quiet, law abiding citizen.

James Drake, the son of the defendant, testified, for the defense, that he was fourteen years old. He was present and witnessed the shooting of the deceased by the defendant, and heard and saw all that transpired between the parties at that time. Defendant, witness and Will Renfro, the witness's cousin, went to the house where the shooting occurred about nine o'clock in the morning. They went there to clean up the premises, as was their usual custom on a change of tenants. They entered the yard at the back gate in the alley, and thence through the front. They found all the doors closed and locked. Deceased reached the house within thirty minutes, and some of his children came five minutes later. Deceased, who had a hatchet in his hand when he came, opened all the doors. Defendant was in the front yard when deceased arrived. Deceased said nothing as he passed into the house.

Within a few minutes defendant, witness and Will Renfro started to leave the place by the way they had entered it. When they reached the back yard, deceased came to the back gallery, and defendant asked him: "Mr. Guinn, are you going to pay the rent for this house?" Deceased angrily replied: "If you had not acted such a God d—d dog I would have paid you the

rent, but now I owe you nothing." Having said this, the deceased threw down the broom which he held in his left hand, changed the hatchet from his right to his left hand, threw his right hand around towards his hip, and said to defendant: "You God-d—d son of a bitch, I have no rent for you, but I have got something else for you!" Thereupon the defendant drew his pistol and fired one shot. Deceased passed into the house, and witness saw no more of him. Defendant, witness and Renfro then went to town, and defendant surrendered to the sheriff. There was no little girl standing by deceased, nor on the back gallery, when the shot was fired. Deceased's youngest daughter was then playing about the well in the back yard. Deceased came into defendant's office a few days before the shooting, and defendant spoke to deceased about the rent. Deceased said that he could not then raise the money, but would give his note. Defendant drew up the note, but deceased declined to sign it upon the plea that he was then too nervous.

Cross examined, the witness said that deceased had the hatchet in his hand when he came to the house on that morning, and had it in his hand at the time of the shooting. He moved a mattress, some wood and other things from the house to the front gallery. Deceased came to the back gallery after the defendant had passed into the back yard on his way to the back gate. When defendant asked him for the rent, deceased called defendant a d—d dog, and said that he had no rent for him. Defendant said: "Guinn, that is hard to take." Deceased then slammed the broom to the floor, changed the hatchet from his right to his left hand, and threw his right hand towards his hip, when defendant fired. Neither of deceased's girls were then on the back gallery. One child was then playing about the well, but the other two had gone off. Witness did not know that his father had a pistol until he fired, nor did he know that defendant went to the house that morning to shoot deceased. Witness saw Todd Zeigler, Street Bacon, Hugo Robinson and Bob Fleming at Rast's store on the night after the shooting, but he did not tell them or either of them that he knew before he left home that his father was going to kill deceased on that morning. No such conversation ever occurred between witness and any of said parties. When deceased was in defendant's office, a few days before the shooting, and was asked for the note, he said he would pay in a short time when he had sold some corn. A day or two before the difficulty the witness took a note from defendant to

deceased, demanding possession of the house because of the default of several months rent.

Willie Renfro, the nephew of the defendant, testified, in his behalf, that the house occupied by Guinn, and known as the Drake house, was the property of witness and his sister, but was in the control of the defendant. Witness spent most of the evening before the shooting with the defendant, at the printing office. It was after six o'clock when witness and defendant went to the house, where they found deceased and Mr. and Mrs. Hall. The deceased was then moving. Defendant asked deceased when he would get through moving. He replied that he would get through that night, and that he would leave the keys on a pillar under the house, and that defendant could get them and take possession of the house on the next day. Witness, defendant and Jim Drake went to the house on the next morning and found it locked. They looked for but did not find the keys. Deceased reached the house about fifteen minutes later. As he passed defendant, defendant said " good morning." Deceased made no reply, but passed on and opened the doors. He then stepped back towards defendant and said to him: " God d—n you, what are you doing here ?" After standing around a while, defendant, witness and Jim Drake started home. About the time they were passing the back gallery, deceased ran to the gallery and slammed his broom to the floor. Defendant then asked deceased if he was going to pay the rent. Deceased replied that he had no rent for him, but had something else. He then changed a hatchet which he had in his right hand to his left hand, and threw his right hand behind him, when defendant drew his pistol and fired. Witness, defendant and Jim Drake then went up town and defendant surrendered. Two of deceased's daughters and his son came to the house a few minutes after deceased did, but the oldest daughter and the son left before the shooting occurred. The youngest daughter was playing about the well in the back yard when the shot was fired. No person was on the gallery with deceased at that time.

Cross examined, the witness said that defendant, Jim Drake and himself were in the front yard, standing near the front gallery, when deceased reached the house on the morning of the shooting. Deceased brought the hatchet with him, and kept it in his hand until he was shot. When deceased cursed defendant and asked what he was doing there, defendant said that he had come to clean up. Deceased replied that he was not yet

through moving.  Witness did not know that defendant had a pistol until he drew it and fired.

Doctor A. H. Sneed testified, for the defense, that he passed the Drake house at exactly thirteen minutes past nine o'clock on the morning of the shooting.  He had occasion to look at his watch as he passed by.  Deceased was then standing on the front gallery with a hatchet in one hand, and something—nails perhaps—in the other.  Defendant and two little boys were standing together in the front yard.  Defendant and deceased appeared to be much excited, and to be engaged in a quarrel. Both were very white in the face and were talking violently. Witness got to Williamson's drug store about noon, and got a message to go to see deceased.  The message, however, had been on the slate for some time, but witness did not know when it was put there.

Cross examined, the witness said that a dray was standing at the back door of the Drake house when he passed it.  It was witness's understanding that the shooting occurred about eleven. Witness had heard of the difficulty between defendant and deceased a few days before, and was apprehensive of trouble when he passed and saw them at the house.

Jake Stevens testified, for the defense, that in August preceeding the shooting, he cleaned out a well for the deceased, who was to pay him two dollars and a half, but failed to do so when the job was finished.  A day or two before the shooting witness started to deceased's house to collect his pay.  He met deceased about two hundred yards from the house, and asked him for the money.  Deceased replied that he would have to see Drake before he could pay, but that if witness would go with him to Drake's office he thought he could pay.  Witness started on down with deceased.  When crossing the railway track deceased mentioned Drake's name and said that he wanted to see that "rascal;" that he slapped Drake in the mouth on the day before, and intended to show Drake how to fool with him. When they reached the building in which defendant's office was situated, deceased told witness to go up stairs and see if defendant was in.  Witness found defendant's office locked.  On the way to the office deceased asked witness: " Do you know a man named Drake?"  Witness replied that he had seen Drake once. Deceased then said:  "That man Drake treated me worse than a negro the other day, and I am going to get him sure—I have something in my pocket that never lies."  Witness put his hand

on deceased's arm and said to him : "Don't do that, Mr. Guinn, you have no money to spend at law." Deceased replied three times that he "would get him sure." Before reaching "up town" on the return, deceased saw a man approaching and said : "There comes Drake; now you will see me get him." Witness told him that the man approaching was not Drake. Deceased repeated that he would "get him" every time they met a man on the way back to town, and they met five men. Witness. had been in jail in Waco, but had never been in the penitentiary.

The defense closing, the State called Reuben Loggins as its first rebutting witness. He testified that the name of the deceased was S. L. Guinn, and that he was often called "S. L." in the family. He, however, often got letters addressed to him as L. S. Guinn, and witness had frequently heard him called L. S. Guinn. He was generally known as Professor Guinn. Witness had known deceased about nine years, and had never heard him utter an oath, and knew that he was not in the habit of swearing. Deceased's reputation as a quiet, peaceable citizen was irreproachable. Witness had never known him to have but one difficulty, and that was in Waller county, when he turned upon a man who had followed him with a knife, disarmed and whipped the man; for which he was generally applauded by the people.

Todd Zeigler, Street Bacon, Hugo Robinson and Bob Fleming, boys aged fourteen and fifteen years, testified, for the State, in rebuttal, that they were in the street, near Rast's store, on the night after the shooting, in company with Jim Drake, the son of the defendant, who testified on this trial. Jim Drake said to them that he knew on that morning, before he left home, that his father was going to shoot deceased on that day.

A. Smith, recalled, testified, for the State, that he was helping deceased move small articles out of his house a few minutes before the shooting. Witness's dray was then at the back of the house. While working with deceased at that time, the witness saw a hatchet on the mantel piece, at the end towards town. When witness left with his load the hatchet was still on the mantel piece. Just before witness left, deceased called to a boy playing in the street to bring him a broom. Witness returned in about thirty minutes, deceased having been shot in the mean time, and found a pile of trash which had been swept up on the gallery, and just beyond it the imprint of a bullet in the wall.

V. C. Cunningham testified, for the State, that he undressed the deceased after he was shot, and found him unarmed.

Mrs. Guinn, wife of the deceased, testified, for the State, that the deceased never used profane language and never carried arms. He went to the Drake house unarmed on the morning that he was shot. Witness, who feared trouble between him and defendant, begged him to take a weapon with him, but he replied that he was too active a man to be hurt by defendant, and refused.

Sheriff Harris testified, for the State, that defendant once tried to cut him with a knife, but failed. Witness heard of one difficulty defendant had at the fair grounds, but knew nothing about it. He observed that in the fight on Austin street, a day or two before the shooting, deceased "got away" with defendant readily.

Mr. Callender testified, for the State, that he knew of a difficulty which defendant had in July, 1887, with the secretary of the anti-prohibition party. Both parties were drunk, and defendant had a knife. They were separated and defendant was taken off in a hack. His antagonist appeared to be abundantly able to take care of himself.

J. P. Clark and C. K. Fleming testified, for the State, that they had known defendant about three years, and that his reputation as a quiet, peaceable citizen was bad.

Mrs Brightwell testified, for the State, that Edna, Nora and Eddie Guinn, children of the deceased, were about the Drake house a few minutes before the shooting, but she did not know where they were when the shot was fired.

The State closed.

Charles Rast testified, for the defense, in rebuttal, that Jim Drake came to his store and made some purchases on the night after the shooting. Two boys were then with Jim Drake. Witness did not remember that Hugo Robinson, Zeigler, Bacon or Fleming were there at the time, though they may have been.

Willie Renfro testified, for the defense, that he went with Jim Drake to Mr. Rast's store on the night after the shooting, and heard all that Jim said to anybody at the store. Jim did not tell anybody that he knew before he left home that morning that his father was going to shoot deceased.

The motion for new trial raised the questions discussed in the opinion.

*Clark, Dyer & Bolinger*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE.    This is a conviction for murder of the first de-
gree with the death penalty.

Twelve men were impaneled as a grand jury.  Eleven pre-
sented this bill of indictment.  Appellant moved to quash be-
cause a member had been excused by the court, had abandoned
the State, and was a resident of the State of Missouri at the
time this indictment was presented.

The position assumed by counsel for appellant is that, unless
there was a grand jury composed of twelve men when the bill
was presented, less than twelve were without authority to act,
the constitutional body being dissolved; that, while it is true
that nine members may constitute a quorum, etc., still there
must be a body composed of twelve men in order to the exist-
ence of a legal grand jury.

Grand juries shall be composed of twelve men, but nine mem-
bers of a grand jury shall be a quorum to transact business and
present bills.    (Const., art. 5, sec. 13.)    The Supreme Court
shall consist of a chief justice and two associate justices, any
two of whom shall constitute a quorum, and the concurrence
of two judges shall be necessary to the decision of a case.  Two
judges of the Supreme Court constitute a quorum, though the
Constitution requires that the Supreme Court *shall* consist of a
chief justice and two associates.

Now, let us suppose that a member of the Supreme Court
should die, evidently there would still be a constitutional court
remaining, with full and complete powers to decide causes,
powers and authority, equal to that possessed by a full bench.
Applying the analogy, suppose three members of the grand
jury should die, would not the remaining nine have all the pow-
ers and functions of a body composed of twelve men?  Would
it be necessary to render their acts legal, for the body, composed
originally of twelve men, to remain unbroken?  If so, why not
apply this rule to the organization of the Supreme Court, and
hold that less than three members would not constitute a court?

We may be answered that the Constitution expressly provides
that two members of the court shall be a quorum.  To this we
reply that the Constitution expressly declares that nine members
of the grand jury shall be a quorum to transact business and

present bills—a quorum to do precisely that which is objected to by appellant, i. e., present bills. If, therefore, the death of a member of the Supreme Court will not affect its existence as a court, for the same reason the death of a member of the grand jury will not dissolve the grand jury and render the acts of a quorum nugatory.

If, however, the Legislature should, in violation of the Constitution, place upon the Supreme bench more than three members, the courts of the country would not hesitate to declare such an organization absolutely void—no court at all. So with the organization of a grand jury. By statute it is made the duty of the judge to impanel twelve men. (Code Crim. Proc., arts. 368, 371, 376, 384, 391.) Twelve constituting the panel, twelve should be impaneled; but from this it does not follow that there must be twelve jurors subject for duty or within the jurisdiction of the court all the while. The object of the provision of the Constitution making nine a quorum was evidently intended to meet any and all contingencies of like character as that presented in this case, or the death of a member. There was no error in refusing to quash the indictment.

The indictment alleged the name of the deceased to be "L. S. Guinn." On the trial his name was proven to be not "L. S." but "S. L. Guinn." It is claimed that the variance is fatal. Inasmuch as the case must necessarily be reversed on other points, and a new indictment can easily and readily be presented by which the variance can be obviated and corrected, we do not discuss this branch of the case, but suggest that the prosecution procure the finding of a new indictment. There is certainly, as the case now stands, much doubt as to the variance having been obviated by the evidence on that point.

By bill of exceptions it appears that justice of the peace Sleeper, learning that Professor Guinn had been shot, went to the house of J. W. Brightwell, in Waco, on August 27, 1887, and found Professor Guinn there and wounded with a pistol shot wound; that, after he got to the place where Guinn was shot, and at which place he arrived about one hour after the shooting, he heard certain declarations made by Guinn. At the time of making such declarations deceased, Guinn, was conscious of approaching death, and the declarations were made voluntarily, and were not made in response to questions put to deceased, and such declarations were first orally made by deceased and then immediately written down by the witness, and

read over to him, deceased, when he subscribed the same. "I do not know where the written statement of deceased so taken down by me is, or what became of it. I gave it to some one, but don't remember to whom I gave it. I gave it to some one a day or so before Guinn died, and have not seen it since. In the oral statement made in my presence by the deceased, as aforesaid, deceased said that he was occupying a house on Sixth street and Cleveland street in Waco, belonging to the defendant, J. M. Drake, and which he, deceased, had been renting from Drake; that he and J. M. Drake, a few days prior to that time, had had a difficulty growing out of the rent of said house; and that he, deceased, was preparing to leave the house, and on the previous day had moved most of his household goods therefrom, and returned on that morning to finish moving, and found J. M. Drake and his two little boys there when he got there, which was shortly after nine o'clock a. m.; and that, as he, deceased, was on the back gallery of the house, sweeping out some trash, J. M. Drake accosted him, deceased, about paying the rent, and deceased replied to J. M. Drake and told him he, Drake, had not acted the gentleman, and therefore he did not consider that he owed him anything, and at this Drake drew his pistol and fired upon and wounded deceased."

To this bill the learned judge appends this statement: "The above bill is given with this modification: Justice of the Peace Sleeper testified that he first took his seat on the bed, when deceased made orally the statements above set out; that when this was done he went to a table and wrote down what deceased had said as nearly as he could, returned to the bed and read it over to him, who signed it. The oral statements were allowed to be testified to, as they were made before the writing was made; but the witness was not allowed to state anything contained in the written declaration."

To the admission of the declarations counsel of appellant objected, because the statements and declarations of deceased having been reduced to writing, and signed by deceased when made, the writing was the best evidence of what deceased actually said, the loss of the written declaration not being accounted for.

From the bill of exceptions it appears that immediately after the written declarations were made they were reduced to writing and signed by deceased. Now the learned judge seems to hold that, as the declarations were made before they were re-

duced to writing, therefore they could be proved by witnesses who heard them, notwithstanding they were immediately reduced to writing. A makes declarations in the presence of B, who immediately reduces them to writing. It is competent to prove by B what A said before he, B, reduced A's statements—sayings—to writing. This simple illustration demonstrates the utter fallacy of the proposition. If the views of the learned judge be correct, the declarations must be written out by the declarant himself, for, if he should dictate to another person, this person could relate to the jury what was said before he could write it out. If reduced to writing at the time, the writing is the best evidence of what the statements were—the best evidence of what deceased said before the declarations were reduced to writing. Sleeper would be more likely to remember correctly for a few moments what was said than for weeks or months. Man's memory is very treacherous and uncertain, while written documents have no such infirmities. (Krebs v. The State, 8 Texas Ct. App., 1; Whart. Hom., sec. 766; 1 Greenl. Ev., sec. 161.) It is not pretended that the non-production of the written declarations was legally and properly accounted for.

It appears from the evidence that the original or a correct newspaper copy of the declarations was brought to the deceased a short time before he died, read over to him, and that he was asked if it was true; to which the deceased replied that it was substantially correct, but that there were some immaterial alterations he would like to make, but that he was too weak to do it; and they were never made. As the writing was the best evidence of what deceased said before his statements were reduced to writing, it is reasonable and probable that the oral statements were correctly reduced to writing and were those shown to him. Now, when his attention was directly called to them, and he was asked whether they were true or not, he answers that they were substantially correct but that there were some immaterial alterations he would like to make. If they were correct, they spoke what occurred at the scene of the homicide. If substantially correct, they reproduced substantially what occurred at the homicide. If, however, alterations were required to make them correct and true; they did not speak the facts which occurred at the homicide, they were not a reproduction of that transaction. But deceased said these alterations were immaterial.

"The statements of the deceased as to the cause of the injury

from which death finally results, when dying declarations within the meaning of the law, are admitted in evidence on the ground of necessity, and the rule under which they are admitted forms an exception in the law of evidence. The accused, under the rule, has not the benefit of meeting the witnesses against him face to face, a constitutional right in all criminal trials with this solitary exception. He is deprived of the security of an oath attended with consequences of temporal punishment for perjury. He is deprived of the great safe guard against misrepresentation and misapprehension—the power of cross examination. The evidence is hearsay in its character; the statements are liable to be misunderstood and to be misrepeated upon the trial, and the evidence goes to the jury with surroundings tending to produce upon the mind emotions of deep sympathy for the deceased, and of involuntary resentment against the accused.

"It is vain to attempt to disguise the infirmities and imperfections of the human mind, and its susceptibility to false impressions, under circumstances touching the heart and exciting the sympathies; and the law has wisely, in case of dying declarations, required all the guarantees of truth the nature of the case admits of." (Starkey v. The People, 17 Ill., 20.)

Suppose deceased were alive and on the stand as a witness. He deposes to the facts attending the killing, and, when asked if his relation of them is correct, he should answer: "Substantially, but there were some immaterial alterations in his evidence he would like to make." Would not the opposing party be eager to know what error needed correction? Would he be willing to leave this matter to the opinion of the witness—let him decide what was substantially correct, what was immaterial? How frequently is it the case that matters of the first importance are considered immaterial by a witness. Witnesses are not judges of the admissibility of evidence, nor of the bearing one fact has upon another. The most learned lawyer can not always in advance appreciate the bearing and importance of all the facts. A fact or circumstance, when viewed alone may be considered trifling—as but chaff—but, when considered with reference to other facts, may be of the greatest importance.

Mr. Greenleaf says: "That if it appears that the declarations were intended by the dying person to be connected with and qualified by other statements material to the completeness of the narrative, and that this was prevented by interruption or death,

so that the narrative was left incomplete and partial, the evidence is inadmissible." (1 Greenl. Ev., 161.)

If too much has been said, the narrative may be as damaging to the accused as if it was partial. If it needs correcting, the defect—the error to be corrected—may be as injurious as if it were partial and incomplete. When we consider this evidence with reference to its awful consequences to the appellant—his right to live depending almost entirely upon it—and when considered in the light of the fact that great pains had been taken to obtain the statements of deceased in writing—they being reduced to writing, signed and sworn to by him, and yet not produced on the trial—we are clearly of opinion that, even if not obnoxious to the first objection discussed, it is not admissible, and that the exceptions presented by counsel for appellant should have been sustained.

Under the peculiar circumstances of this case, the court should have limited or restricted the purpose of the testimony of the four witnesses who testified to the statements of Jimmie Drake, made at the store house of Rast. This was not criminative evidence, but evidence for the purpose of impeaching Drake. (Alexander v. The State, 21 Texas Ct. App., 407, and cases there cited.)

Other portions of the charge are complained of, but there being no special exceptions, when taken as a whole, the errors are not such as require a reversal of the judgment.

For the reasons above stated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*