## COLLIER vs. THE STATE.

It is a well established rule of practice that, where there is a motion for a new trial, such previous exceptions as are not incorporated in the motion, must be regarded as having been waived.

The overruling of a motion for a continuance cannot be made a ground for granting a new trial. (*Magruder vs. Snapp*, 4 *Eng.* 108.)

Where a special term of the Court is ordered for the trial of a prisoner indicted for murder, he will not be heard to object to being put upon his trial on the ground that the special term was not ordered on his petition, or that no notice had been given him or his counsel that the special term had been ordered.

Where dying declarations have been reduced to writing, etc., the writing should be produced—parol evidence of the declarations cannot be given; but where the deceased has also made other declarations, at a different time, which were not reduced to writing, parol evidence is admissible to prove them.

Where several accessories before the fact are jointly indicted with the principal, they are incompetent witnesses for him upon his trial (*Moss vs. The State*, 17 *Ark*. 330); and so, also, is the wife of an accessory in such case.

Though the jury be guilty of misconduct—by conversation and intercourse with others during the progress of the trial—sufficient to merit reprimand or punishment, a new trial will not be granted if it appears that there was no abuse and no injury resulted to the defendant from such misconduct.

Where the prisoner does not avail himself of the means afforded him by law of

ascertaining whether a juror is impartial or not, at the time he is placed upon the stand to be accepted or challenged, he will not, after conviction, be allowed to make the objection, that the juror had formed and expressed an opinion adverse to him, as a ground for a new trial.

*Appeal from Johnson Circuit Court.*

Hon. FELIX I. BATSON, Circuit Judge.

SOLOMON F. CLARK, for the appellant.

Though the statute, authorizing special terms to try criminals in jail, does not, in express terms, require notice to be given to defendants, still we conceive it to be a right guarantied by the spirit, if not the letter, of the constitution: without notice, he could not have his witnesses ready, or take steps to procure them until brought into Court. See *Dunn vs. State,* 2 *Ark.* 229.

The dying declarations had, when made, been reduced to writing, and signed by the deceased, with the view of being evidence, and the writing was not produced, or its absence accounted for. It is laid down, in almost all the elementary works, that where the declarations have been reduced to writing, parol evidence of them is not admissible. *Wharton's Criminal Law* 182; 2 *Russell on Crimes* 763; 1 *Greenleaf on Evidence, sec.* 161; *Rex vs. Gay,* 7 *Carr. & Payne* 230; 12 *Vin. Abr.* 118; *Leach vs. Simpson,* 1 *Law and Equity R.* 58; *Rex vs. Benson,* 1 *Str.* 599. This is no exception to the rule that wherever the law admits hearsay testimony, if in writing, the writing itself must be adduced. The Court therefore erred in admitting the declarations on this ground.

After the State had closed her testimony, the defendant offered to prove his absence from the fact of killing, by three witnesses—John Nooner, Henry M. Nooner, and Mary Ann Nooner; but the Court refused to permit the witnesses to testify, upon the ground that the first two were parties to the record, charged as accomplices, and the third was the wife of the first.

That a party charged as an accomplice may be a witness for

his associate, if not put upon trial with him, see 2 *Russell on Crimes* 958; 2 *Stark.* 13; 2 *Hale, P. C.*, 280; 2 *Roll. Abr.* 685, *pl.* 3; *Dock vs. Hayton, Fortes.* 246; 1 *Greenl. Ev., sec.* 379. A contrary doctrine would operate most oppressively by enabling a prosecuting attorney, who might, as in this case, feel so disposed, to include, in the same indictment, all persons who might be witnesses for the defendant, and thus get rid of their testimony. But whether or not a person charged as accomplice is a competent witness in such case, undoubtedly the wife is competent in case her husband is not put upon trial at the same time. See *Moffat vs. The State*, 2 *Humphrey*; *United States vs. Henry, Wash. C. C. R.* 228.

The proof shows that there was a free and unrestricted intercourse and commingling between the State's attorneys and the jury, when at their room and absent from the Court room. They sat out upon the porch together, and read, sung and conversed when they pleased.

This is sufficient to set aside the verdict. In such cases, the Court does not require proof of actual tampering; it is sufficient that an opportunity has been afforded for any one to tamper or exert an influence with them, or any one of them. See *Overton vs. Com.*, 1 *Robinson* 756; *Kennedy vs. Com.*, 2 *Virginia Cases* 510; *McLain vs. State*, 10 *Yerger* 241; 18 *Johns.* 218; *Rex vs. Button*, 4 *Maule & Sel.* 532; *Whitney vs. Whitman*, 5 *Mass.* 405; *Hackley vs. Haster*, 3 *Johns.* 252; *Sheaff vs. Gray*, 5 *Yeates* 273; *Lansdale vs. Brown*, 4 *Wash. C. C. R.* 148. Or at least it is only necessary that reasonable suspicion of abuse should exist. *People vs. Douglass*, 4 *Cow.* 22; *Horton vs. Horton*, 2 *Cow.* 589; *State vs. Prescott*, 7 *New Hampshire* 290; *State vs. Babcock*, 1 *Conn.* 401; *State vs. Miller*, 1 *Dev. & Bat.* 500; *Wyatt vs. State*, 1 *Blackf.* 25. If this were not the law it is easy to see to what extent verdicts might become contaminated without the possibility of detection. And indeed if parties or persons interested are permitted to intermingle and hold conversation with the jury, under such circumstances as the present, who can estimate the amount of influence that may

be exerted upon them, without any actual tampering or communication upon the subject of the trial, whatever? And will the Court refuse to set aside the verdict under any proof of such influences, short of actual bribery or corruption? Chief Justice Parker, in the case of *Sergeant vs. Roberts*, 1 *Pick*, 342, upon setting aside a verdict, because of a communication made to them by the judge, after they had retired from the bar, holds this language: "The public interest requires that litigating parties should have nothing to complain of or suspect in the administration of justice, and the convenience of jurors is of small consideration compared with this great object." We think there can be certainly no doubt but what this Court ought to set aside the verdict on this ground.

JORDAN, for the State.

The statute does not prescribe that notice be given to the prisoner, of the order for holding a special term. The record shows that the requisites to holding a special term were literally and strictly complied with. *Dunn vs. The State*, 2 *Ark*. 253.

We have no statute requiring declarations *in extremis* to be reduced to writing as a condition precedent to their admission as evidence in a criminal cause, nor is it required by any rule of the common law. *U. S. vs. Gilbert*, 2 *Sumner* 73; *Collier vs. State*, 13 *Ark*. 676. It is then no violation of the rule that oral evidence cannot be substituted for an instrument which the law requires to be in writing. 1 *Greenl. Ev.*, secs. 86, 90. The ground upon which objection is made to the dying declarations, as evidence, is, the admission of oral testimony to prove the contents of a writing while the writing itself is in existence This is not the case here—neither of the witnesses testified as to the contents of the writing. The following authorities are submitted to show that oral evidence is admissible even where the declarations have been properly reduced to writing. 1 *Meiggs Rep.* 106; *Roscoe Cr. Ev.*, (5 *Am. Ed.*) 34; 1 *McNally* 385; *Rex vs. Carty*, *McNally's Ev.*, p. 45; *Whart. Cr. L.* 251,

*and authorities cited.* It is shown in this case that deceased, on several occasions, detailed the circumstances of the killing: parol evidence of such declarations made at a time when they were not reduced to writing, is admissible. 1 *Greenl. Ev., sec.* 161; *Roscoe* 33.

It is too well settled to require argument or authority that an accomplice, joined in the same indictment, is not a competent witness for his co-defendant, until he is tried and convicted, or discharged. *Moss vs. The State,* 17 *Ark.; The People vs. Bill,* 10 *J. R.;* 1 *Yerger* 431; 10 *Pick.* 57; 1 *Greenl. Ev., sec.* 363.

And it is equally well settled that the wife is not a competent witness for a co-defendant, if her testimony would tend directly to her husband's acquittal. 1 *Greenl. Ev., sec.* 335, 407, *and note; Roscoe Cr. Ev.* 148; *Whart. Cr. L.* 295.

It is submitted that the testimony not only shows that there was no tampering with the jury, but even removes all suspicion of abuse. It is affirmatively shown that no person, during the progress of the trial, conversed with the jury, or in their presence or hearing, upon the subject of the trial. The general rule, upon this subject, according to an almost unanimous current of decisions in the American Courts, is, that the verdict will not be set aside, even in a capital case, for misconduct or irregularity of the jury, unless it be such as might affect their impartiality, or disqualify them for the proper exercise of their functions. *Whart. Cr. L.* 895, *and authorities there cited; also, pp.* 897, 898, 899; *Cornelius vs. State,* 7 *Eng.* 809; *Stanton vs. State,* 13 *Ark.* 317; 12 *Pick.* 515; 1 *Cowen* 221; 2 *Ib.* 589; 7 *Wend.* 423; *United States vs. Gilbert,* 2 *Sumner* 82; *McCarter vs. Com.,* 11 *Leigh* 633; *Ib.* 714; 7 *New Hamp.* 290; 7 *Watts & Serg.* 415.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

The appellant, Wilson W. Collier, was tried and convicted of murder in the second degree, in the Johnson Circuit Court, and sentenced to the penitentiary for seven years. Pending

the trial he excepted to a number of decisions made by the Court, and, after verdict, moved for a new trial, incorporating in the motion some of the exceptions, previously taken by him, as grounds for a new trial, and omitting others. According to a well established rule of practice, such of the previous exceptions as were not incorporated in the motion for a new trial, must be regarded as having been waived. The motion for a new trial being overruled, he excepted, and appealed, the Court below granting a stay of execution, and admitting the prisoner to bail until the judgment of this Court could be taken upon the errors complained of. The several grounds upon which the new trial was asked, will be disposed of as they successively present themselves upon the record.

1. The Court overruled a motion made by the appellant for a continuance.

It appears that the appellant moved for a continuance of the cause, on account of the absence of Combs and wife, witnesses, by whom he expected, as stated in the motion, to prove that *Dennis Griffin*, the person charged to have been murdered, made an assault, etc., upon him sometime previous to the killing, threatened his life, etc., etc.

It is sufficient to remark, in reference to this point, that it has heretofore been decided, by this Court, that the overruling of a motion for a continuance cannot be made a ground for granting a new trial. *Magruder vs. Snapp*, 4 *Eng*. 108.

2. The appellant was put upon his trial at a special term of the Court, without notice that the special term had been ordered, etc.

The record shows that at a regular term of the Circuit Court of Johnson county, commencing on the 16th of March, 1857, an indictment was preferred against the appellant, as principal, and George W. Collier, Levi Collier, John Nooner and Henry M. Nooner, as accessories before the fact, for the murder of *Dennis Griffin*. They were served with a copy of the indictment, and committed to the custody of the sheriff, etc.

On the 16th of May following, the Circuit Judge made an

order for a special term of the Court, to commence on Monday, the 8th of June, 1857, for the trial of the appellant, and the other parties named in the indictment, who were, at the time, confined in the jail of Johnson county. The order was filed in the clerk's office, and spread upon the records of the Court on the day it was made.

The special term of the Court was accordingly held on the 8th of June; and on the first day of the term, the prisoners were brought into Court, arraigned, pleaded not guilty, and a *venire* was ordered, etc. On the 10th of June, the *venire* having been returned on the day before, the prisoners interposed a challenge to the array of veniremen; which was overruled by the Court. The prisoners then asked to be severed in their trials; which was granted. On the 12th of June, the appellant filed the motion for continuance above referred to. On the same day, the prosecuting attorney proposed to put the appellant upon his trial, and to proceed to the selection of a jury; to which he objected on the grounds that he did not *petition* the Court to order the special term for his trial, and that no *notice* had been given to him or his counsel that the special term had been ordered, etc. But the Court overruled the objection, and directed the trial to proceed, etc., and the appellant excepted, etc.

The Statute provides that: "the judge of any Circuit Court may, at any time, hold a special term for the trial of persons confined in jail, by making out a written order, to that effect, and transmitting it to the clerk; who shall enter the same on the records of the Court." That the judge ordering the special term, "shall cause a notice thereof to be served on the attorney for the State, prosecuting for such circuit, ten days before the commencement of such special term." But that "no special term of the Circuit Court shall be held within twenty days of the regular term of such court," etc. *Gould's Digest*, *ch*. 50, *sec*. 21, etc., etc.

The special term in question seems to have been ordered and

held regularly in accordance with the provisions of the statute. See *Dunn vs. State*, 2 *Ark*. 229.

Though the provision for special terms was, doubtless, designed for the benefit of persons imprisoned, in order to secure them " a speedy public trial," etc., in accordance with the Bill of Rights, yet the authority of the judge to order a special term is not made, by the statute, to depend upon the *petition* or desire of the prisoners to be tried: the public, as well as the prisoners, having an interest in the matter, to be re- garded by the judge.

Nor does the statute require the prisoners to be notified of the ordering of the special term for their trial. It is made the duty of the judge to transmit the order to the clerk, who is, required to enter it upon the records of the Court, and thus it, receives publicity, and would hardly fail to come to the knowl- edge of the prisoners, who are in custody of an officer of the Court, etc.

But, no doubt, if it were shown to the satisfaction of the judge, that a prisoner had in fact received no information of the ordering of the special term for his trial, that material wit- nesses for him were consequently absent, and that he was not prepared for trial, etc., the judge would have the sound legal discretion to continue the cause, or postpone the trial until the witnesses for the prisoner could be sent for.

But, in the case before us, the appellant objected to being put upon his trial simply upon the grounds that he had not petitioned the judge to hold a special term for his trial, and that no notice had been given him, or his counsel, that it had been ordered, etc., without any showing, in connection with the objection, that he had in fact received no information that the term had been ordered, or that, for want of notice, he had taken no steps to prepare for trial, etc. On the contrary, it is to be inferred, from several facts appearing of record, that he was informed of the order for the special term in time to make preparations for his trial. The order was made and entered upon the record of the Court on the 16th of May. He stated

in his motion for a continuance that, on the 23d day of May, he caused a subpœna to be issued by the clerk of the Court for *Combs and wife*, which was some fifteen days before the time fixed for the holding of the special term. It also appears that quite a number of witnesses were examined in his behalf upon the trial, and that he was defended by an ample array of counsel.

3. The third ground of the motion for a new trial is, that the Court erred in admitting parol evidence of the dying declarations of Griffin, when his *dying declarations were proved to have been reduced to writing, read to him, signed and sworn to by him, as such, before a justice of the peace, and the writing not produced, or its absence accounted for.*

There is some confusion in the record as to the state of facts upon which the Court admitted parol evidence of the dying declarations, etc. At the time they were admitted, the appellant took a bill of exceptions, attempting to set out the facts; and in the principal bill of exceptions, taken to the decision of the Court overruling the motion for a new trial, the facts were again stated. Considering the statements contained in the two bills of exceptions together, and the following facts appear with reasonable certainty:

On Monday morning (26th January, 1857,) Griffin received his mortal wound from a rifle gun, discharged by the appellant, and died on the following Sabbath. About 10 o'clock, on Monday night, he made dying declarations which were reduced to writing in his presence, signed and sworn to by him, as such. On the day before he died, and when he was in a very low and sinking condition, these declarations were copied off, and the copy read over to him in his presence and hearing, assented to by him as correct, signed and sworn to by him before a magistrate. The copy was the same as the original, except the name of the appellant was misstated.

The attorneys prosecuting for the State, stated that the written evidence of the dying declarations, so taken, was not in their possession; and proved by the administrator of Griffin that it

was not in his possession, and that he did not know where it was.

Whereupon, the Court permitted two witnesses (*Sellars* and *Howell*) to testify to the dying declarations made to them by Griffin, on Monday morning, about 10 o'clock, soon after he received his mortal wound, and which were not reduced to writing at the time, etc.

When dying declarations have been taken down in writing, and signed by the deceased, the writing is the most reliable memorial of the declarations made by the deceased at the time, and should be produced; and it has been held that neither a copy of the writing, nor parol evidence of the declarations, can be admitted. 1 *Phillip's Ev.*, 291; *Rex vs. Gay*, 7 *Car. & Payne* 230; 32 *Eng. Com. Law Rep.* 586.

But in *Reason's Case*, 16 *How. St. Tr.* 31; *Same Case*, 1 *Strange* 500, three several declarations had been made by the wounded person, in the course of the same day, at the succesive intervals of an hour each, the second had been made before a magistrate and reduced to writing, but the others had not; the original written statement taken before the magistrate, was not produced, and a copy of it was rejected. A question then arose whether the first and third declarations could be received, and Pratt, C. J., was of the opinion that they could not, since he considered all three statements as parts of the same narration, of which the written examination was the best proof; but the other judges held that the three declarations were three distinct facts, and that the inability to prove the second, did not exclude the first and third, and evidence of those declarations was accordingly admitted. *Starkie Ev.*, —; 1 *Phill. Ev.*, 290; *Roscoe Cr. Ev.* 34; 1 *Greenl. Ev.*, sec. 161.

In the case before us, the Court below appears to have followed the rule in *Reason's Case*. The declarations which were reduced to writing, and not produced, were made about 10 o'clock of the night, and the declarations which the Court permitted to be proven by parol, were made about 10 o'clock of

the morning of the day on which the deceased received his mortal wound.

It is insisted, in the argument of the counsel for the appellant here, that the declarations of the deceased were admitted without a sufficient showing that they were made under the immediate apprehension of death. This objection was made and overruled at the time the declarations were admitted, and the decision of the Court excepted to, but the exception was not made ground of the motion for a new trial, and was consequently abandoned.

The exception to the decision of the Court refusing the instructions moved for appellant, was, in like manner, abandoned.

4 & 5. The fourth and fifth grounds of the motion for a new trial are, that the Court erred in not permitting John Nooner, Henry M. Nooner, and Mary Ann Nooner, to testify on the trial on behalf of the appellant.

John Nooner and Henry M. Nooner were jointly indicted with appellant as accessories before the fact to the murder of Griffin, and being parties to the record, were not competent witnesses for their co-defendant. *Moss vs. The State*, 17 *Ark.* 330.

Mary Ann Nooner was the wife of John Nooner. After the State had introduced testimony conducing to prove that appellant was not only present when Griffin was shot, but that he fired the gun which produced his death, the appellant offered to introduce Mrs. Nooner, as a witness, to prove that he was not present; but the Court excluded her from testifying.

Her husband being a party to the record (indicted as an accomplice), and being an incompetent witness for the appellant, she was likewise incompetent. *State vs. Smith*, 2 *Iredell L. R.* 405; 1 *Greenl. Ev.*, sec. 407; *Roscoe Cr. Ev.* 151.

6, 7 & 8. The sixth, seventh and eighth grounds of the motion for a new trial, may be considered together. They assert that the jury were tampered with, guilty of misconduct,

etc., etc., during the trial. In support of these grounds for a new trial, the appellant introduced the following affidavits:

*Hershy* swore that, on Tuesday night, after the jury were empannelled, and had heard part of the evidence on the trial, he saw them on a porch in front of their room, up stairs, at the hotel. They were engaged in singing: and Pleasant Jordan, who was assisting the State's attorney in prosecuting, was among them, and singing with them. Saw no person with the jury but him.

*Robinson* swore that, on the same night, and at the place referred to by Hershy, he saw Mr. Jordan singing, and intermingling with the jury. They sung three or four tunes, by note. Affiant was not close enough to hear any conversation, but there was considerable intermission between tunes.

*Cravens* swore that, on the night above referred to, he saw Mr. Jordan and Lafayette Gregg, the prosecuting attorney, associating and singing with the jury. They were up stairs, at the hotel, on the porch in front of the room occupied by the jury. They were singing around the same candles, and the same tunes, with the jury. The room in which the jury were kept was adjoining that occupied by Jordan and Gregg, a plank partition separating them. The porch was 30 or 40 feet long. Affiant frequently saw the jury scattered from one end of the porch to the other.

*W. S. Cravens* swore that he also saw the jury on the porch, and with them Lafayette Gregg, and also the officer who had the jury in charge. That Gregg and the jury were close together, the former having a book in his hand, from which he seemed to be reading and gesticulating to the jury, who seemed to pay close attention to him. Affiant was, however, not near enough to hear any conversation.

*John Robinson* swore that he was the officer who had the jury in charge. That on the night in question, Jordan and Gregg were with, and sung with the jury: that he was present all the time, that neither of them said any thing to the jury, except as to the selection of the tunes they should sing. That

he was confident nothing was said as to the trial, and that he watched closely, for fear something would be said in that connection. That this occurred upon the porch in front of the jury-room, which adjoined that of Gregg and Jordan, both of which opened upon the porch. That, by his leave, Howell, a witness who testified upon the part of the State, asked one of the jury what he would take for a certain horse, and the juror told him; but nothing was said as to the case. Affiant heard every word that was said.

On the part of the State, the affidavits of Jordan and Gregg were taken.

*Jordan* swore that, it being in the summer season, and the weather warm, he was sitting on the porch in question, in front of his own room, and the jury were also in that part of the same porch which fronts the room occupied by them. That some of the jury began to sing, but it did not appear to affiant that they carried the base well; whereupon, he told them that he could give it the " *proper air*," and thereupon went into that part of the porch which they occupied, and struck in, and sung the base of the tune with the jury. That he remained there afterwards until they had sung five or six tunes—during this time Gregg came up and joined them in singing three of the last tunes sung. Affiant said nothing to any of the jury about the case, nor they to him, nor did he hear any thing in that connection between Gregg and any of the jury.

*Gregg* admitted the singing, but denied having any conversation about the cause. Admitted that he frequently read books on the porch, but denied that he ever read aloud so that the jury could hear him; nor did he talk to any of them during the trial about any thing whatever that had any relation to the trial. That, on one occasion, one of the jury asked him where *Parson Robinson* was, and he merely told him where he was in reply. The jury sometimes eat at the public table at the same time that affiant and other persons did, but he never heard any one talking in their hearing about the case.

There were also taken the affidavits of Basham, a deputy

sheriff, and Griffiths, the sheriff, both of whom at different periods during the trial, had charge of the jury, to the effect that the jury when in their charge conversed with no one; and thus the whole period of time, from the empanneling of the jury until their discharge, was covered by the affidavits of the three officers having them in charge.

Doubtless the Courts should be vigilant to preserve the trial by jury in its purity, and whenever the misconduct of the jury can be reasonably supposed to have resulted to the injury of a party, a new trial should be granted. When jurors have been empanneled, it is their duty to listen impartially to the testimony, and carefully weigh it; to avoid all intercourse with the parties, their counsel, and even strangers, on the subject they are sworn to decide; not to separate, unless by permission of the Court and consent of the parties, while the trial is in progress; to take the law from the Court, and after the testimony is concluded, and they are charged with the cause, to retire to some convenient place, and there confine themselves to the evidence submitted to them in the presence of the Court; to admit neither persons nor papers to their retirement; and neither eat nor drink at the expense of either party, nor disperse until they have agreed upon their verdict, and are discharged by order of the Court.

"If, in any of these particulars, they wilfully violate the law, especially if abuse ensues upon their misconduct, it will subject them to punishment as for a misdemeanor, and in many instances will also vitiate their verdict.

"If at any time intermediate the opening of the cause and their rendering of their verdict, the jurors suffer themselves to be approached and labored by the parties or their agents, and find for that party, their verdict will be set aside, 1 *Graham & Wat. on New Trials, p.* 63.

"But if a party, after the jury are sworn, speak with a juryman, but nothing touching the business in issue, this doth not avoid the verdict given afterwards for him." 2 *Hale's Pleas of the Crown, p.* 308.

Although the affidavits in this case clearly enough show misconduct, such as merited reprimand from the Court below for the jury, and punishment for the officer having them in charge, as well as for the two gentlemen of the bar, who, from mere indiscretion, doubtless, mingled with the jury merely for pleasant recreation; nevertheless we see no reasonable ground even for suspicion of actual abuse. On the contrary, it very satisfactorily appears that there was no abuse; and, perhaps, as little opportunity for it, as will be generally found practicable in our circuits, where so many conveniences, common in the older States, for closing all the avenues to the jury box against intrusion, are as yet wanting. This state of things redoubles the duty of vigilance which is upon the officer having the jury in charge, for which he should always be held to the strictest account.

Upon the subject of the misconduct of the jury, the practice in this country appears to have resolved itself into the exercise of a judicial discretion, confining the motion for a new trial to the question of abuse, and invariably denying the application where no injury has resulted. To this practice the decisions of this Court have conformed in the cases heretofore brought up, as in *Cornelius vs. The State*, 7 *Eng. R.* 784, and *Stanton vs. State*, 13 *Ark.* 317, which were cases of misconduct, by separation and intercourse with persons not of the jury. And it is in accordance with this doctrine that we conclude that the alleged misconduct in this case is not made out by the affidavits, etc.

9. The ninth ground of the motion for a new trial was, that *Philip May*, one of the jurors, had formed and expressed an opinion adverse to the prisoner, previous to his being sworn as a juror, of which fact the prisoner was not advised until after the rendering of the verdict.

In support of this ground, the appellant produced the affidavit of one *Norrid*, who swore that about a month before the trial, *May* said to him that the appellant, and those jointly indicted with him, were clever fellows, but that from what he

had heard, he feared it would go hard with them, alluding to the indictment for the murder of Griffin.

It is sufficient to remark in reference to this ground, passing over other objections to its being regarded as cause for a new trial, that it does not appear from the record that appellant availed himself of the means afforded him by law of ascertaining whether *May* was an impartial juror or not, at the time he was placed upon the stand to be accepted or challenged by the parties. Hence the objection falls within the rule established in *Meyer vs. The State*, 19 *Ark. R.* 163.

10. The tenth and last ground of the motion for a new trial is, that the verdict was contrary to law and evidence.

The substance of the evidence, so far as it need be stated, is, that Griffin erected a fence, near his house, upon a piece of land, which he had purchased, and to which the appellant set up a claim by length of possession. On Monday morning, of the 26th of January, 1857, the evidence conduces to show that appellant, and his accomplices, armed themselves, went near to Griffin's house, and commenced removing the rails from the fence referred to—Griffin went out and requested them to desist, to which one of them replied, *you attend to your business, and we will attend to ours*, or something to that effect. Griffin then returned into the house, got his gun, and walked out of the yard gate toward the fence in question, carrying his gun down by his side, in his left hand—when he was shot, from behind a tree, by one of the parties, before he made any attempt to use his gun. The testimony conduces to prove, as before remarked, that the appellant fired the gun which produced his death.

We think there was no want of evidence to sustain the verdict of the jury.

The judgment of the Court below must be affirmed.

# ORDER.

And it is ordered that the clerk of this Court transmit to the

clerk of the Circuit Court of Johnson county, without delay, a duly certified transcript of the judgment of this Court herein; and, upon the filing of the same, the clerk of said Circuit Court shall make and deliver to the sheriff of said county, a duly certified transcript of the conviction and sentence of said Wilson W. Collier, as required by law, together with a copy of the judgment of this Court; and issue a writ of capias to the said sheriff, commanding him to take the body of said Wilson W. Collier, and deliver him to the jail and penitentiary house of this State, in accordance with said sentence; and, in the event of a failure to take said Collier, and carry his sentence into execution, that said sheriff make due return of said writ to the Circuit Court of said county next thereafter, that a forfeiture of his recognizance may be taken, and proceedings had against his bail on account of his failure to render himself in execution.