## J. T. MORRIS v. STATE.

No. A-407. Opinion Filed June 6, 1911.

1. **HOMICIDE—Evidence—Absence of Witnesses—Explanation.** The state may show why a person who was present immediately after defendant fired the fatal shots had gone away to another state, as otherwise he should have been called as a witness.

2. **HOMICIDE—Clothing as Evidence.** Gloves worn by the deceased at the time he was shot were properly admitted as evidence.

3. **HOMICIDE—Dying Declarations.** Proof that the deceased was shot about 9 a. m., and died that night, that his wounds were necessarily fatal and that he stated to the persons present immediately after he was shot "that he could not live, that there was no chance for him to live," and "that he was going to die," sufficiently shows that the deceased appreciated the certainty and imminence of his impending death, and is in itself a sufficient predicate for the admission of his statements of the circumstances of the homicide as dying declarations.

4. **HOMICIDE — Dying Declarations — Different Statements—Admissibility.** Where a person, mortally wounded and without hope of recovery, under the solemn conviction of impending death makes several complete statements at different times of material facts concerning the cause and circumstances of the homicide, one of which statements was reduced to writing, the prosecution is not confined to the written statement, but may offer oral evidence of the statements made at other times, whether the several statements were similar or not. Should any of such separate statements be inconsistent or contradictory it is open to the defense to show the fact.

5. **HOMICIDE—Dying Declarations—How Contradicted.** A dying declaration may be contradicted by proof of the declarant's contrary statements or otherwise and with the same effect as the testimony of a witness.

6. **HOMICIDE—Evidence—Photograph of Dead Body.** The defendant claimed that the deceased was pointing a pistol at him when he fired the first shot. Photographs of the body of the deceased showing the location of the wounds in the right arm and right side ranging forward and on the back of the deceased were properly admitted in evidence.

7. **WITNESSES—Attorney and Client—Privileged Communications.** Professional communications between a lawyer and his client are not privileged, when such communications are had for the purpose of being guided or assisted in the commission of a crime.

(Syllabus by the Court.)

*Appeal from District Court, Stephens County; Frank M. Bailey, Judge.*

J. T. Morris was convicted of manslaughter, and appeals. Affirmed.

J. T. Morris, plaintiff in error (hereinafter designated the defendant) was indicted in the district court of Comanche county, territory of Oklahoma, on the 24th day of September, 1907, for the murder of George Bordner. Subsequent to the return of said indictment that portion of Comanche county, territory of Oklahoma, in which it was alleged said homicide had occurred, was placed within the boundaries of Stephens county, state of Oklahoma, as designated by the Constitution of the state.

Thereafter, to wit, on the 6th day of January, 1908, upon the application of the defendant for a removal of the case from Comanche county to Stephens county, Oklahoma, the district court

of Comanche county made an order transferring the case ·to the district court of Stephens county, and under said ·order the clerk of the district court of Comanche county transmitted to the clerk of the district court of Stephens county a transcript of all records and proceedings had in said cause in Comanche county. And the defendant was by the sheriff of Comanche county delivered to the sheriff of Stephens county to be held subject to the orders of the district court of the Fifteenth judicial district.

Thereafter, to wit, on the 3rd day of March, 1908, an order was made by the judge of the district court for the Fifteenth judicial district allowing the defendant bail in the sum of fifteen thousand dollars, and on said day said bond was executed by the defendant and his sureties and approved by the clerk of the district court of Stephens county.

A trial was had which resulted in a mistrial. On November 2, 1908, the second trial of said cause was begun in the district court of Stephens county, and on November 7th the jury returned into open court their verdict finding the defendant J. T. Morris guilty of manslaughter in the first degree. Motion for a new trial was duly filed.

November 19, 1908, the motion for a new trial was by the court overruled. To which action of the ·court the defendant then and there duly excepted, and judgment was .pronounced and entered. The defendant was sentenced to be confined in the state penitentiary ·at Lansing, in the state of Kansas, for a term of seven years at hard labor.

From which judgment the defendant appealed by filing in this court on November 4, 1909, a petition in error with case-made attached.

The facts briefly stated are as follows:

The deceased and the defendant lived for several years on adjoining·farms about two miles west of Comanche. The farms were separated by a barbed wire fence. The defendant lived about a quarter of a mile north of where the shooting occurred. The road south from defendant's·house passed about sixty yards from this place, there being a small lot between the road and the

place where the shooting occurred.   It seems that the live stock of the deceased had been trespassing on the defendant's land by going through the division fence.   On the morning of the tragedy the deceased had put a negro to work for him cutting stalks, and then went over to the place of the shooting for the purpose of repairing the division fence.   The particular point at which he was at work was on the east side of the lot referred to.   The deceased was in his shirt sleeves and had heavy gloves on, a small hammer and an alligator wrench and a pocket knife in his pants pocket.   He was filling the place where his hogs and goats were going under the fence by bringing brush and placing it therein.

The defendant came to where he was and remonstrated with him about the manner in which he was fixing the fence, telling him that the work he was doing was practically useless.   According to deceased's dying statement, the defendant used very rough language towards him and when the deceased indicated to the defendant that if he, the defendant, would tend to his own business he would find it a good way to get along with his neighbors, the defendant became quite angry, turned away saying, "I will catch you out sometimes and beat hell out of you," and then walked back to his house, secured his gun, and came back down the road and when he was opposite the point where the deceased was at work passed into and through the lot over to where the deceased was working.   When last seen just before entering the lot he was carrying the gun on his shoulder walking at a brisk gait.   He changed the gun from his shoulder to his arm, walked into the lot, and in about a half-minute from that time the shooting occurred.   There were no eyewitnesses, but there were two or three tenant houses on the defendant's farm which were but a short distance from the place of the shooting, and when the shots were fired, some of these parties ran out and found the defendant walking away and the deceased lying in his field about twenty steps from the line fence.   His glove was on his right hand and about six feet from where he fell was the hammer and the glove from his left hand.   The deceased stated that, after the defendant returned a few words passed when the defendant made

a remark indicating that he was going to kill him. The deceased was at that time in a stooping position, pushing some brush under the fence. The fence was between them. As he raised up, he turned to run, when the first shot was fired, which entered his right arm and the right side of his abdomen, the bullets all ranging forward. As he ran away the second shot was fired which entered his back between his shoulder blades, and this was the wound that the doctors testified was fatal. The shooting occurred about nine o'clock in the morning. The deceased was' hollowing for help and one of the defendant's tenants went toward him and met the defendant, who said to him, "Go up there and do all you can for him." The defendant returned to his house and another of his tenants, Geo. Curley, came to assist and care for the deceased. Later in the day Mr. Hudlow, Boone, Woolsey and other friends of the defendant went to the scene of the shooting, and, after looking around, an open knife was picked up near where the deceased fell. These friends of the defendant, after finding the knife, returned to his residence, and one of them holding the knife up asked, "Did you ever see this before?" The defendant replied that he had seen the knife that morning, down at the place of the killing.

On the trial of the case the defendant made no contention that the deceased was attacking him with a knife, but claimed that the deceased had a pistol drawn on him and that he shot to prevent the deceased from shooting him.

The deceased died about midnight on the day he was shot.

*J. B. Wilkerson* and *Gilbert & Bond,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., (*Cruce, Cruce & Cruce,* of counsel), for the State.

DOYLE, J. The petition alleges twenty-three assignments of error. With one exception they are all based on the rulings of the court in the admission of testimony. The majority of the assignments are unimportant and were not referred to in the oral argument. They have all been examined, however, and

6 Cr.—2

such of them as are deemed worthy of comment will be considered here.

The first objection relates to the testimony of Mrs. Margaret Curley. The witness testified that at the time of the homicide she was living as a tenant on the defendant's place with her children, one a son named George Curley; that she was making garden and saw the deceased and the defendant near the line fence talking; that the defendant went home and immediately returned to the line fence with a shotgun; that witness then went into the house and presently heard two shots fired. She then started to the defendant's home and met her son going to the place of the shooting. That her son was now in Texas.

She was then asked:

"Q. What did your son go to Texas for, to make his home? A. He went there to make it his home; he could make better wages there."

The answer was permitted over the objection of the defend-ant. Counsel contend that this is error.

The testimony shows that her son, George Curley, was the first, or among the first, to arrive on the scene after the shooting, and was not present at the trial. It was therefore competent to show where he was and why he was absent, as otherwise he should have been called as a witness.

It is contended that:

"It was error for the court to admit in evidence the gloves worn by the deceased at the time of the homicide for the reason that the defendant offered to admit that the wounds were in the location alleged in the indictment and that they were fatal, and for the reason that they did not serve to explain any controverted issue, and the tendency was to create prejudice."

Counsel cites in support of this proposition, *Crenshaw v. State,* 85 S. W. 1148, 48 Tex. Cr. 77; *Melton v. State,* 83 S. W. 822.

In the latter case the court says:

"It is permissible to introduce the bloody clothing when their introduction serves to illustrate some point or solve some question or throw light upon some matter connected with the proper solution of the case, but under no other circumstances."

The gloves were properly admitted as evidence. In view of the fact that the defendant claimed that the deceased was trying to shoot him with a pistol held in his right hand, and there was some uncertainty as to which hand the glove was on at the time of the shooting, this evidence was competent as tending to show whether or not the deceased was attempting to use a pistol, and it clearly showed that it was only the right hand glove that was blood stained, the blood having run down the wounded arm into the right hand glove, and tended to prove that the deceased had this glove on his right hand when he was shot.

"The gloves were competent for the purpose of enabling the jury to determine whether or not the deceased with those gloves on his hands would likely have been able to draw a small pistol from his pocket and fire it." *Saunders v. State,* 4 Okla. Cr. 264; *Bennefield v. State,* 2 Okla. Cr. 44, 100 Pac. 34.

It is also contended:

"That the court erred in admitting photographs taken of the body of the deceased three weeks subsequent to the homicide for the reason that they were incompetent, irrelevant and immaterial, and could serve no purpose except to inflame the minds and arouse the passion of the jury."

It appears from the evidence that about three weeks after decedent's death the prosecution procured three photographs of the body showing wounds on the right arm and the right side ranging forward and on the back between the shoulder blades.

The general rule is without contradiction, that, where the photograph is shown to be a faithful representation of whatever it purports to reproduce, it is admissible, as an appropriate aid to the jury in applying the evidence, and this is equally true whether it relates to person, things or places. Rice Crim. Ev. p. 154; Wharton's Crim Ev. (9th. Ed.) sec. 544.

In the case of *Cowley v. People,* 83 N. Y. 464, 38 Am. Rep. 464, Folger, C. J., said:

"So far as the circumstances of the taking of these pictures, and the purpose of them in evidence were concerned, in our judgment they were properly received, if copies of objects taken by that process are ever competent in evidence. And we are now to consider whether they are, under a proper state of facts, and

for a proper purpose, competent evidence. We know not of a rule, applicable to all cases, ever having been declared, that they are not competent. Nor do we see, in the nature of things, a reason for a rule that they are never competent. We do not fail to notice, and we may notice judicially, that all civilized communities rely upon photographic pictures for taking and presenting resemblances of persons and animals, of scenery and all natural objects, of buildings and other artificial objects. It is of frequent occurrence, that fugitives from justice are arrested on the identification given by them. 'The Rogues' Gallery' is the practical judgment of the executive officers of the law on their efficiency and accuracy. They are signs of the things taken. A portrait or a miniature taken by a skilled artist, and proven to be an accurate likeness, would be received on a question of the identity or the appearance of a person not producible in court. Photographic pictures do not differ in kind of proof from the pictures of a painter. They are the product of natural laws and a scientific process. It is true that in the hands of a bungler, who is not apt in the use of the process, the result may not be satisfactory. Somewhat depends for exact likeness upon the nice adjustment of machinery, upon atmospheric conditions, upon the position of the subject, the intensity of the light, the length of the sitting. It is the skill of the operator that takes care of these, as it is the skill of the artist that makes correct drawing of features, and nice mingling of tints, for the portrait. Most of evidence is but the signs of things. Spoken words and written words are symbols. Once a deaf mute, born so, was presumed in law an idiot (1 Hale, 34); but later days look upon him as not incompetent to be a witness, if he in fact have understanding and knows the nature of an oath. *Rustin's case,* 1 Leach Cr. Cas. 408. He is now taught to give ideas to his fellow-men by signs, and his deprivation of some of the common faculties of humanity does not exclude him from the witness-box. The signs he makes must be translated by an interpreter skilled and sworn. So the signs of the portrait and the photograph, if authenticated by other testimony, may give truthful representations. When shown by such testimony to be correct resemblances of a person, we see not why they may not be shown to the triers of the facts, not as conclusive, but as aids in determining the matter in issue, still being open, like other proofs of identity or similar matter, to rebuttal or doubt. A witness who speaks to personal appearance or identity, tells, in more or less detail the minutia thereof as taken in by his eye. What he says is a description thereof, by one mode

of signs, by words orally uttered. If his testimony be written instead of spoken, and is offered as a deposition, it is a description in another mode of signs, by words written; and the value of that mode, the deposition, depends upon the accuracy with which his words uttered are put into words written. Now, if he has before him a portrait or a photograph of the person, and it shows to him a correct copy of that person, if it produce to his view a correct description, which he testifies is a likeness, why may not that be given to the jury, as a description of the person by the witness in another mode of signs? The portrait and the photograph may err, and so may the witness. That is an infirmity to which all human testimony is lamentably liable. But when care is taken to first verify that the process by which the photograph was taken was conducted with skill and under favorable circumstances, and that the result has been a fair resemblance of the object, the picture produced may, in many of the issues for a jury, be an aid to determination."

Counsel for the defendant in his statement of the case for the defense said:

"The first shot will show that Bordner's arm was in this position just as if he was going to draw his pistol. and the force of the shot, the shotgun was a choke bore, and the first shot turned Mr. Bordner around when they struck him."

We do not think there was any error in admitting the photographs. These photographs were offered in evidence for the purpose of showing the location of the wound, and that the deceased, when he was shot, could not have been in the position claimed by the defendant. Their correctness was verified by the testimony of the photographer, J. B. Majors, who testified that he had ten years' experience as a photographer. The fact that they were taken almost three weeks after death would not make this evidence incompetent. Nor do we believe there was any error in admitting the photographs even though they tended to show the atrocity of the crime. They were almost conclusive evidence of of the fact that the defendant shot the deceased while he was trying to flee. The evidence in the case is clearly sufficient to justify a verdict of murder, and the fact that the verdict was only manslaughter is conclusive that the verdict was not the result of prejudice or passion.

In the case of *Saunders v. State, supra,* Justice Richardson said:

"Nor is the state required in such cases to stand on the oral testimony of one or two witnesses without supporting their testimony by demonstrative evidence; nor can the state be precluded from offering such evidence by a general statement made by the defendant's attorney in objecting to the evidence that 'there has been no dispute raised as to the mortality or location of the wounds.' Mr. Wigmore in his work on Evidence says that the objection that the sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient reason, cannot be entirely overcome; 'but,' says he, 'it is to be doubted whether the necessity of thus demonstrating the method and results of the crime should give way to this possibility of undue prejudice. No doubt such an effect may occasionally and in an extreme case be produced; and no doubt the trial court has a discretion to prevent the abuse of the process. But, in the vast majority of instances where such objection is made, it is frivolous, and there is no ground for apprehension. Accordingly, such objections have almost invariably been repudiated by the courts.' Here the issue was whether or not the defendant acted in self-defense, and the exact point of entrance of the bullets was a very material circumstance in determining that question. And it would seem that if the average jurors are so unreasoning, their sensibilities so readily affected, their faculties so easily overcome, and their minds so quickly inflamed with prejudice and passion, as to require the withholding from them of evidence to which all reasonable persons concur in giving probative value, then the jury system must be a frail and fragile thing indeed, and a jury's verdict the very essence of inconclusiveness and uncertainty, a veritable 'blind man's guess.' "

See cases cited in the footnote to section above quoted (sec. 1157, Wigmore on Ev.).

Eight assignments of error relate to the rulings of the court upon the admission of dying declarations. It is contended "that the proper predicate had not been laid to admit this evidence." The record shows that the shooting occurred about nine o'clock a. m.; and that Bordner died that night about midnight; that Dr. Cowman, a practicing physician who was called to attend the deceased, arrived there about ten o'clock. Dr. Cowman testified

that he told the deceased that he did not think there was any chance for him to live and that the deceased replied that he thought so too. Witness was then asked and permitted to testify over defendant's objection to the statements made by the deceased concerning the circumstances of the shooting. Several other witnesses were also permitted to testify to similar oral statements. The written statement was then offered and admitted over the objection of the defendant. It is as follows:

"Territory of Oklahoma, County of Comanche ss: I, George H. Bordner, having been informed by my physician that I am going to die, and believing myself that death is impending, do in the presence of S. J. Castleman, Robert Burns, Dr. Cowman, H. W. Sitton, C. S. Wade, H. A. Hall, H. L. Howery, Alice E. Wolfe make this my dying declaration and statement of the manner and circumstances connected with the shooting of myself by J. T. Morris on today the 10th of April, 1907, as follows: *Question by Sitton* (Note. This is written in this manner [italics] and scratched out.) George, do you believe you are going to die? Ans. Yes, I have thought so all the time. By Castleman. State the conditions under which you met Mr. Morris this morning? Ans. I went up in the field to show a darky some stalks to cut, and Mr. Morris come down on his side of the fence and went across to where some ladies, that looked like they were planting some garden or something, I walked across the field to adjust the cutter, I was standing at the south end of the field to see the boy make another round with the cutter, Morris come down on his side of the fence to the corner of my field and said he wanted to show me where my fence was over on his side. He said that he was going to move his fence and that I had a wire fastened to a tree that stood on his land and he wanted me to take it off. I told him that he told me to put that wire on there but if at any time he wanted to cut that tree to go ahead and cut it and sometime when I was fixing fence I would put a post there. He asked me to come up to the fence so he could talk to me. I was standing about 25 or 30 feet from the fence and Morris was right up against the fence, I told him I did not come out there for no scrap nor no words, he went on to tell that he had heard a whole lot I had said about him and he was going to hold me accountable for it, and also that I had a negro that had been into some trouble and he was going to hold me accountable for that, I told him I did not have any negro that had bothered him or any of his people and that he was mistaken in his man. He wanted

to know who it was, I told him I didn't know who it was, he then began to abuse me and called me a god damned thief and called me every dirty thing he could think of and said if I would come over there he would just whip hell out of me, I told him I did not come out there for any words and would thank him to attend to his own business as a gentleman should. He was telling me how low my standing was in the neighborhood, and I told him a man was known by his treatment of his neighbors and by his dealings with them and that I had adopted that plan and had been getting along very well ever since and that if he and I would adopt the plan we would agree better. That made him mad and he started for the house and said god damn you I will catch you out some day and I'll make you sorry for this. I saw him in a few minutes with a gun walking up and down leisurely, finally come up to the fence, said my pigs were eating up that old widow lady's corn, I asked him if it was sucking pigs and asked him if that big black hog was mine that was in the field then, then he come up with gun and said I couldn't fix fence with brush, and I told him it would not fix it permanently but that it would do until I could get some posts and help, I went after some more brush and asked him to kill a goat that was over in his field, he said didn't want to kill stock, I had a hammer in my left hand and just raised up from placing brush under the fence and as I rose up he said, 'god damn you, I'll get you now.' We were standing face to face, and as I turned to run he fired and shot me in the right arm, and turned and run when I saw the gun pointed at me, I was running from the fence when he shot me in the back the second time and knocked me down. *He stood* (Note the mark is drawn as represented here [italics]) *stood there and looked at me* about a minute, I tried to turn over and couldn't, I turned on my side, I saw him standing there and throw the shells out of his gun and loaded his gun. Mr. Castleman. Mr. Bordner I now show you a knife, is that the only knife you had about your person at that time? Ans. Yes, that is the only knife I had, I didn't have it in my hand and hadn't used it today and had no arms of any kind, just had a hammer and a little alligator wrench. Q. Did you make any threatening gestures toward the person of Mr. Morris to assault him in any way? Ans. No, sir. Have you ever made any threats toward Mr. Morris to any person at any time? Ans. No, sir. I tried to call the darkey, couldn't make him hear, then I got my head turned around and called Mr. Cooper and he came down there. There was no one else present when the shooting occurred. Mr. Cooper called a young man who

worked for Mr. Morris, he was a read-headed young man. He came over and did all he could for me. He went and got a wagon sheet and covered me up and then called my darkey for me and the darkey went after the buggy and took me home.

"The above statement was taken from George H. Bordner, by Robert Burns in the presence of the witnesses whose names appears hereto subscribed, on this April 10th, 1907.

"Signed His
"GEORGE H. (X) BORDNER.
"MARK.

"S. J. CASTLEMAN,
"ROBERT BURNS,
"H. W. SITTON, W. L. HOWERY,              Witness to Mark.
"H. A. HALL, ALICE E. WOLFE,              H. W. SITTON,
"C. S. WADE.                              ROBERT BURNS."

The written statement is reiterative of the oral statements.

It is essential to the admissibility of dying declarations, and is a preliminary fact to be proved by the prosecution, that they were made under a sense of impending death. This may be made to appear from what the injured person said, or where from the nature and extent of his injuries it is evident that he must have known that he could not survive. It is sufficient if it satisfactorily appears that they were made under the sense of impending death, whether it be directly proven by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical attendants, stated to him, or from other circumstances of the case, such as the length of time elapsing between the making of the declaration and his death, and the fact that the declarant was so weak that he could not sign his name and so affixed his mark, all of which are resorted to, in order to ascertain the state of declarant's mind. In this case the evidence abundantly shows that the deceased, when he made the statements received in evidence, had no hope of recovery and appreciated the certainty and imminence of his impending death. The record shows that he stated to the first person who reached him that John Morris had killed him. He also stated to the parties who carried him to the house that Morris had killed him; that

he could not live; that there was no chance for him to live and that he was going to die.

It is insisted that the court erred in admitting parol declarations when the proof showed that the declaration of the deceased was reduced to writing and in the possession of the prosecution; and in support of this contention counsel call attention to the case of *Drake v. State,* 25 Tex. App. 293, 7 S. W. 868.

The doctrine of the Drake case has been much modified by the Court of Criminal Appeals. In the case of *Hunter v. State,* 129 S. W. Rep. 125, the court says:

"The rule seems to be that, where the state reproduces a dying declaration which is one of several made by deceased, though he made one in writing, the oral declaration is admissible if it was made at a separate and distinct time from the written declaration. The rule that secondary evidence of the contents of the written document is not admissible does not apply in cases of this sort. *Long v. State,* 78 Tex. Cr. R. 175, 88 S. W. 203; *Phillips v. State,* 50 Tex. Cr. R. 130, 94 S. W. 1051; *McCullough v. State,* 50 Tex. Cr. R. 133, 94 S. W. 1056. In the case of *Brown v. State,* 54 Tex. Cr. R. 121, 112 S. W. 80, a number of dying declarations of the deceased Johnson were admitted in evidence, and among others, one in writing."

We think the sound rule supported by reason and authority is that where statements of material facts concerning the cause and circumstances of the homicide are made at different times by the victim, under the solemn conviction of impending death, one of which was reduced to writing, the prosecution is not confined to the written statement, but may offer oral evidence of the statements made at other times, whether the several statements were similar or not.

Prof. Wigmore says:

"Dying Declarations. (a) Where an auditor has made a written statement of the declarant's oral utterances, this written statement is not preferred testimony, and therefore need not be produced; for there never was any principle in the law of evidence preferring one person's written memorandum of testimony to another's oral or recollection testimony. Nor is the case changed because the person thus making a written statement was a magistrate having power to administer oaths or take testi-

mony on a preliminary hearing; for such a person has no duty or authority by law to report dying declarations, and it is solely by virtue of an express duty, as we have seen, that a magistrate's report of testimony is preferred to other witnesses. (b) Where a written memorandum thus taken down is read over to the declarant and signed by him, the writing becomes a second and distinct declaration by him, and therefore on principle his first and oral declaration is provable by any auditor without producing the second and written one. Such is the result accepted by a few courts; but the majority, misapprehending the nature of the written utterance, and proceeding apparently on the mistaken analogy of a deposition, require the writing to be produced. Of course, if the written one is desired to be proved, it must be produced. (c) Where the declarant makes one oral statement, and afterwards on a separate occasion a second statement, the latter being in writing or orally made but taken down in writing and signed, there are here clearly two distinct statements (whatever view may be held as to [b] *supra*), and therefore the first or oral statement may be proved without producing the other or written statement; this is generally accepted. Distinguish from this question the operation of the principle of completeness (*post,* sec. 2099), which requires the whole of a single utterance to be proved, and not merely fragments; this principle has nothing to do with the mode of utterance as written or oral; it requires that the whole, whether written or oral, be proved, and it permits one separate utterance to be proved without regard to another separate utterance, whether either or both are oral or written." (Wigmore on Ev., sec. 1332.)

"(b) Where a written memorandum or report thus made is read over to the declarant and signed or assented to by him, the writing thus becomes a second and distinct declaration by him. The first oral statement is not merged in the later written one, because, since the transaction is not a contract or other legal act between two parties thereto, the rule of Integration, or Parol Evidence rule (*post,* sec. 2425), has no application. The first and oral declaration is therefore provable without producing the later written one. Nevertheless, the majority of courts, accepting the superficial analogy of the Parol Evidence rule or of Depositions (*ante,* secs. 799, 802), require the writing to be used, excluding testimony to the oral statement. It may be noted that of course so far as the proponent is offering to prove the terms of the writing, not of the oral utterance, the writing must be produced." (*ante,* sec. 1449).

"(c) Where the declarant makes one oral statement, and afterwards at another time a second statement, the latter being in writing or reduced to writing, there are here two distinct statements, and either one may be offered without testifying to the other; for the principle of Completeness (*ante,* sec. 148) requires only that the whole of a single utterance should be offered together, and in the present instance the declarant, though referring to the same occurrence, is nevertheless making distinct statements, each of which is independently admissible. It is thus clear (1) that separate oral utterances are admissible, even though the written one has been proved; (2) that, even before or without proving the written one, the separate oral ones are admissible,— though on the latter point the courts are not always explicit." (Wigmore on Ev., sec. 1450.)

See, also, *Morrison v. State,* 28 South. 97; *Collier v. State,* 20 Ark. 36; *People v. Simpson,* 48 Mich. 474, 12 N. W. 662; *State v. Carrington,* 50 Pac. 526; *Dunn v. People,* 50 N. E. 137.

It is also contended by counsel for defendant that in view of the testimony of S. J. Castleman, who was called as a witness for the defendant, the court erred in admitting the written statement as a dying declaration.

And in their brief they say:

"The dying declaration was written by the witness Castleman, who had been retained by the family of Bordner to prosecute the plaintiff in error, and while his conduct is not commendable, the motives which prompted him to write a statement as strong as possible against the defendant, Morris, must be taken into consideration and should not be ignored simply because it is so repugnant to our own sensibilities."

Castleman testified that he was an attorney at law at that time associated with Robert Burns; that he was called on the morning of the tragedy to the home of the deceased and asked about the county attorney; that he told them that the county attorney lived at Lawton, forty miles away, and was out running for office. That they then employed him to take the case and get up the evidence for the prosecution; that the deceased was lying on the dining-room table and Mrs. Bordner was crying; that he went into another room to have a consultation with Mrs. Wolfe, sister of the deceased; that he noticed a pistol lying in

a drawer, and that there was a splotch on the handle, and he told Mrs. Wolfe to put the pistol away, that there would be a fight in the courts about it; that he examined the place where the shooting occurred, and returned to the house to take the declaration; that Dr. Cowman said that he did not want to excite the patient by telling him that he was going to die, and that he would let him know in time for him to take the declaration; that Dr. Cowman said his paient ought to pull through; that this was said in the presence of the deceased; that the deceased said he ought to pull through all right and told him that he wanted him to look after matters; that he returned to Comanche and was called back that afternoon by Dr. Cowman; that upon his return he asked the deceased if he felt as well as he did that morning; that the deceased said that he ought to pull through. That they took his statement in writing.

He also stated:

"We had to be very careful in taking it as the man was very weak and he would choke up and he did not seem to understand what we was trying to get at, and I would ask him the question and then he would ask me a question, and then I would repeat it to him; sometimes Mr. Burns would not hear what he said and sometimes he would ask me what he said and I would tell him."

He further stated that the next day he and Mr. Burns altered the written declaration, and that he appeared and prosecuted the defendant upon his preliminary examination. No objection seems to have been made to the testimony, although it would have been incompetent as privileged were it not for the fact that he is self-confessed guilty of a violation of section 2193, Snyder's Statutes, providing that every person guilty of falsely preparing any instrument in writing, or other matter or thing, with intent to produce it, or allow it to be produced as genuine upon any trial, proceeding or inquiry whatever, authorized by law, is guilty of a felony. For this reason the communications lost their character as privileged, as the rule of privilege does not extend to communications made in furtherance of any criminal purpose.

The written statement had thereon the names of seven subscribing witnesses. Several of these persons were called and testified that the statement was read to the deceased before he signed it, and that as admitted and read to the jury it was so made by him.

"In the absence of a statute, the rule requiring a dying declaration to go in as a whole has no application here." (*Mulkey v. State*, 5 Okla. Cr. 75, 113 Pac. 532.)

A consideration of all the evidence clearly shows that the written statement was properly admitted as a dying declaration.

Robert Burns, who was elected at the first state election county attorney of Stephens county and conducted the trial of this cause, testified as a witness and denied any knowledge of the alteration of the written declaration testified to by S. J. Castleman.

Plaintiff in error's brief contains an uncalled for and unwarranted criticism of Mr. Burns and his manner and method of conducting the prosecution. In answer thereto counsel for the state in their brief use the following language which meets our approval:

"We cannot pass this branch of the case without referring briefly to what we regard as an unwarranted attack made upon the county attorney, Mr. Burns, by plaintiff in error, in his brief. It must be conceded that Burns was unfortunate in ever having been associated in the practice of the law with Castleman. Castleman, on the witness stand, admits that he would suborn witnesses and manufacture perjured testimony to convict an innocent man of murder. Because Burns took the witness stand and denied any knowledge of this claimed villainy, of Castleman's, he is attacked most viciously in the appellant's brief. We submit that there is nothing in the record to justify this attack upon him, and that the only criticism that could be laid at his door is that he was, perhaps, derelict in his duty in not prosecuting this witness for perjury. The court will observe, when it reads Castleman's testimony, that he not only confessed to the worst form of moral putridity in his effort to destroy the dying declaration, but that he falsely testified that when he got to the deceased's house, after the shooting, he found a pistol lying on the dresser, with stains on it, and sought thereby to convey to the jury the belief that the

deceased was armed at the time of the killing and that the stains on the pistol handle were blood stains. It is difficult to deal with such a witness. We have frequently, in our practice, met men who approached him, but he is the first one who ever claimed to belong to the honorable profession of the law. We confess that we are unable properly to picture this man. Language that would properly characterize him would not sound well in print."

The testimony on the part of the state tended strongly to prove that the killing was unprovoked, and the circumstances were such as would well have justified a conviction of murder, and we find nothing in the record that would reflect upon the credibility of the witnesses for the state.

We find no error in the record. The judgment of the lower court is that the defendant be confined in the state penitentiary at Lansing, Kansas. In this respect the judgment is hereby modified and the place of imprisonment changed to the state penitentiary at McAlester, Oklahoma.

The judgment of the district court of Stephens county as modified is hereby affirmed with direction to immediately proceed to carry into effect the judgment and sentence of the court, and the time of sentence of said defendant shall begin when he shall be delivered to the warden of the state penitentiary at McAlester, Oklahoma.

FURMAN, P. J., and ARMSTRONG, J., concur.