*In the Matter of the Disbarment of* C. E. ELLIOTT.

No. 14,532.     (84 Pac. 750.)

SYLLABUS BY THE COURT.

1. EVIDENCE—*Privileged Communication—Requisite.* In order for a communication from a .client to his attorney to be confidential and to impose upon the attorney the duty of not disclosing the same it must be of a confidential character, and so regarded, at least by the client, at the time, and must relate to a matter which is in its nature private and properly the subject of confidential disclosure.

2. —— *Attorney and Client—Publication of · Communication by Client.* An answer which has been prepared for the purpose of being filed by or on behalf of the client, and which has been read by the notary, with the consent of the · client, and the substance of which has been given by the client to a newspaper reporter and published, and which answer has been shown by the client to, and—with client's consent— read by, an attorney appearing against said client in the proceeding in which it was to be filed, and the substance of which answer has been incorporated into a petition by the client against his attorney and filed in another action, is not such a confidential communication.

3. ATTORNEYS—*Disbarment Proceeding—Limitation of Action.* While there is no statute of limitations which is technically applicable to a disbarment proceeding, yet where the alleged misconduct set forth in a charge is shown to have occurred more than thirteen years before the charge is filed in this court, and it appears that proceedings to investigate the occurrence were instituted soon thereafter and proceeded so far that an accusation was prepared and the accused made known his defense thereto, and that thereupon the district court having jurisdiction, and the members of the bar thereof, dropped further proceedings, and thereafter the judge of that court and the members of the bar recognized the accused professionally and socially, this court will not consider such charge. It is at least stale.

Original proceeding in disbarment. Opinion filed February 10, 1906. Accused acquitted.

*W. P. Hackney,* for the accuser.

*Stanley, Vermilion & Evans,* and *Gleed, Ware & Gleed,* for the accused.

The opinion of the court was delivered by

SMITH, J.: In this proceeding this court is the trier of the facts involved, as shown by the evidence, as well as of the questions of law presented. We must weigh the evidence—must determine between conflicting statements what is most probably the truth. The evidence is presented in many voluminous depositions and exhibits thereto attached; so we have not the opportunity of a jury or of the ordinary trial court of observing the appearance and bearing of the witnesses and their manner of testifying, which aids so largely in determining their credibility.

The history, therefore, so far as it is disclosed by the evidence, of the accuser and of the accused and other witnesses, and especially of their relations to this proceeding, becomes of more than usual importance, as does also the *animus* of the accuser, disclosed by the briefs. The following is a general outline of their history, as shown by the evidence:

The accused was admitted to the bar in Illinois in 1882, and practiced law in that state till 1885, when he came to Kansas and settled at Wellington, where he has ever since practiced his profession. It is conceded by the prosecution, and testified to by his associates, that he had for nearly twenty years before the filing of the charges in this proceeding been prominent in the practice of his profession, and it does not appear that his integrity had theretofore been questioned, except in the matter set forth in a supplemental charge alleging an attempt to bribe Judge Ray in 1891, to which we will recur.

The accuser, Cleo D. Burnette, was admitted to the bar in 1895, and after serving as justice of the peace and probate judge went into partnership with the accused in 1900. His ability seems to have been well recognized, and it does not appear that his integrity was ever questioned until the genuineness of a letter copied in the letter-book of Elliott & Burnette, under

*In re* Elliott.

date of May 31, 1902, was disputed.  He was found
guilty of forging this letter, and disbarred by the
district court of his county in 1903.  He removed to
California soon after his disbarment to recuperate his
health, but returned after a residence there of some
months, and in June, 1905, filed the charges in this
proceeding.

A reading. of the testimony of the accuser and the
accused impresses one with the apparent frankness
and unevasiveness of the accused in his answer, and
in giving his testimony, while the accuser in one part
of his deposition depicts himself as being, for a con-
siderable period of time, in such a condition of mind
as to be practically unconscious of what took place
in his presence and unaccountable therefor, and in
another part he recites, to the minutest details, events
which he says occurred within the same period, and
in connection with the very acts for which by reason
of his mental condition he claims to be unaccountable.
By reason of this we have been unable, where a crimi-
nating fact depends upon the assertion thereof by the
accuser alone and the denial thereof by the accused,
to find the existence of the fact established by the
clear and satisfactory evidence requisite to sustain a
charge of this character, which is at least *quasi*-crimi-
nal.  (*Peyton's Appeal*, 12 Kan. 398, 405.)

The accusation in this case contains fourteen sepa-
rate charges:

(1) The attempt by letter to coach and procure a
witness to falsify by denying an existing fact.  We
think the weight of the evidence is adverse to the
charge.

(2) Secreting and withholding a case-made.  It is
shown and admitted that the accused did withhold a
case-made for a day and two nights from another at-
torney entitled to the possession of it.  We fail to
discover, however, that any fraud or wrong was in-
tended or accomplished thereby.

(3) That the accused perjured himself by testifying

that a certain answer was sworn to by Burnette. The answer had been seen by the accused, was signed by Burnette, and was duly certified as sworn to by a well-known notary public. The most that can be said is that the accused swore to a conclusion reached in a legal manner, and did not know the fact from the evidence of his own senses. This was not perjury, if he believed the fact to exist, but simply incompetent testimony.

(4) Misconduct in the Smith divorce case. We find no fact in this case that should disbar an attorney. The contract was not champertous.

(5) Blackmailing Stevens to extort money from him. This charge rests entirely on the evidence of Stevens, and the denial of the most important parts by the accused. No denial, however, was necessary. If true, the story makes out a doubtful case of attempted blackmail. But the witness discredits himself. "I don't remember," given in answer to very numerous questions calling for facts which appear to have been necessarily within his knowledge, is the common cloak of a smooth prevaricator. If the memory of this witness is as poor as his cross-examination indicates, it would be quite unsafe to base an important finding of fact upon it.

(6, 7, 8, and 11) These charges all relate to the concoctions of whisky and morphine claimed to have been found in the accused's desk in the office of Elliott & Burnette. It is claimed both of them drank from a bottle in the desk at different times, and that by reason thereof Burnette became almost a physical and mental wreck. The charge is most serious—a charge of poisoning. If the death of Burnette had ensued, and if the concoction were shown to have been the cause thereof, and if it were shown that the same had been administered by Elliott, or that the poison was by Elliott put in a place under such circumstances that Burnette would probably swallow it, with a design on Elliott's part that he should so take it, the crime of

murder in the first degree would be fully established. If the facts are as claimed, and the concoction was of the deadly character sought to be proved, the crime is lower in grade only because death did not ensue; but the same moral turpitude is involved.

What is the proof to establish this grave charge? Elliott testifies that he had bought morphine in the town (Wellington), and that he told Burnette so, and also told him that he (Burnette) never got any of it. This was after Burnette returned from California, and Burnette does not seem to have denied the statement, at least when made.  Burnette also testifies that he did not buy the morphine for himself.  Elliott denies that he gave or furnished to Burnette such a decoction or caused him to drink the same.  Burnette testifies that after the filing of the disbarment proceeding against him both he and Elliott were under the influence of drugs and whisky nearly every day.  For what length of time he does not say, nor does he at any time say that Elliott induced him or asked him to drink.  The identity of the bottle containing the liquid analyzed by Doctor Mochel with the one taken from Elliott's desk is quite well established, but the evidence of the identity of the contents thereof is not satisfactory.  According to analysis and evidence of Doctor Mochel, if Burnette's testimony as to the frequency of their drinking be true, both Elliott and Burnette should be dead.  Burnette's evidence does not fix the responsibility of the drinking any more on Elliott than upon himself.  Even when pressed to do so he does not say Elliott induced him to drink, or even that they drank together, but says "we had been drinking it at the office."

Nor are we satisfied that Burnette's physical and mental ill health resulted from the use of the concoction of whisky and morphine, as alleged.  The testimony of his attending physicians tends to disprove rather than to establish this theory.  In short, we do

not find any of these charges sustained by the evidence.

(9) This is really a double charge: (1) A conspiracy between Elliott and three other lawyers in preparing the answer of Burnette in his disbarment proceeding, knowing the same to be false; (2) that Elliott, having acted as attorney for Burnette in the disbarment proceeding, produced a copy of this answer in court, offered to identify it, and when it was ruled out as a privileged communication handed it to a member of the committee appointed to prosecute. The first branch of this charge is utterly refuted by Burnette's own letters from California, and a number of witnesses, if not by his own evidence. The facts alleged in the second part of the charge are fully established as charged. The question then arises, Was the answer a privileged communication? We answer this question in the negative.

"In order for a communication from a client to an attorney to be within the rule excluding evidence thereof on the ground of public policy, it must be of a confidential character, and so regarded, at least by the client, at the time, and must relate to a matter which is in its nature private and properly the subject of a confidential disclosure." (23 A. & E. Encycl. of L. 67, and cases there cited.)

The only purpose of preparing this answer evidently was that it be filed in court in the case in which it was entitled and thus made public. Burnette had evidently not treated it as private, as he had been instrumental in having the substance of it printed in a newspaper, had requested, or at least allowed, the notary before whom he verified it to read it. He had previously presented it to the very man to whom Elliott is alleged to have presented it, allowed him to read it, and not only urged that he be allowed to file it in the same case in which the breach of professional secrecy is charged but also procured others to solicit that privilege for him. He had also made the answer public by

setting forth the substance of it in a petition for damages against Elliott in the same court.

(10) That Elliott conspired with others and advised Burnette to refuse to testify on August 6, 1903. If after Burnette had recovered his physical and mental health he had testified when called upon as a witness in court regarding the facts of which he had refused to speak months before, we might conclude from the circumstances that he had been influenced by some one in making such refusal. Instead, however, he again refused to speak, and at a time when it cannot be claimed that he was under the influence of Elliott or his alleged coconspirators. This circumstance, in the conflict of evidence, lends preponderance to the negative of the charge.

(12) That for the year previous to the filing of these charges the accused had been an habitual drunkard. The evidence shows that Elliott's conduct in the respect charged has been far from exemplary—in fact, has been such at times as should subject him to severe criticism. Yet the evidence of the successive judges before whom he has practiced law for many years shows only one instance in which Elliott has appeared in court in such a condition of intoxication as to attract attention thereto, or to affect his business capacity. No client of his, unless it be Burnette, has been produced to testify that his business has been neglected, or suffered in any way by reason of Elliott's intemperance, or who has testified to any facts that would justify such conclusion. True it is that a man is required to show upon his admission to the bar that he is of good moral character. His license to practice after he is admitted, however, will not be revoked on account of objectionable personal habits until it is shown that such habits have rendered him unable to attend properly to his duties as a lawyer, or have rendered him unworthy of the great trust and confidence generally accorded to the members of the profession, or that such habits have become so bad as to scandalize

his profession or the courts in which he practices. We do not think the evidence sufficient to establish either of these conditions in this case.

(13) The testimony falls so far short of sustaining this charge that we pass it without discussion.

(14) Nearly fourteen years before the filing of these charges Elliott had a conversation with Judge Ray relating to a sum of money which had been deposited to indemnify sureties on bonds for the appearance of certain defendants in criminal cases then pending in Judge Ray's court. From his understanding of the proposition the judge was justly very indignant. He made a statement in open court soon thereafter, and appointed a committee of members of the bar to draft a charge against Elliott, which was done. Elliott thereupon made a statement of his understanding of the conversation and his purpose therein, which statement differed radically from the judge's version. Elliott's statement seemed plausible, and apparently was given credence by the court and members of the bar, as the proceeding was dropped; and Judge Ray, as well as the members of the bar conversant with the charge, thereafter recognized Elliott, both professionally and socially, as no men of right thinking could have done if they believed Judge Ray had not been mistaken in his version of the matter.

Conceding there is no statute of limitation applicable to a charge of this nature, it must at least be said that it is very stale; and in this *quasi*-criminal proceeding the action of the court, and the many years' acquiescence therein of the members of the bar to whom the alleged facts were made known at the time, should be regarded as an acquittal of Elliott of this charge. At least, the claim is so stale, and the circumstances so strongly indicate that both the bench and the bar most intimately associated with the accused concluded, after hearing the version which he gave of the conversation, that the judge was mistaken in his version thereof, that we decline to reconsider the matter now.

*In re* Elliott.

We have, we may say, examined with care each of the numerous charges in succession, and the evidence offered in support of the same and in rebuttal, and our conclusion is that no act of misconduct charged has been so clearly established by the evidence as to justify the disbarment of the accused. It is not a question between the accuser and the accused, but between the accused and the public. If the accused has been shown to be guilty of such misconduct that the public should be protected from the implied recommendation for integrity with which he is armed as a member of the bar, that recommendation should be withdrawn and he should be disbarred. On the other hand, his means of livelihood should not be forfeited, and the honorable position to which his ability and a life of toil have entitled him should not be wrested from him, and his declining years embittered with disgrace, unless these criminating charges or some one of them have been clearly established.

Disposed as is this court to encourage and assist in maintaining a high standard of integrity in the profession of which we are members, and realizing as we do that no profession, except perhaps that of the clergy, demands a cleaner private life or a keener sense of professional honor than does that of the lawyer, we are unable under the evidence in this case to impose this great forfeiture and penalty upon the accused. He is therefore acquitted.

All the Justices concurring.