## Ross ANDERSON v. THE STATE.

### No. 8878.   Decided November 12, 1924.

#### No motion for rehearing filed.

**1.—Forgery of Land Title—Witness—Accomplice—Who are.**

Appellant was convicted of forgery of a land title under Art. 947 C. C. P. One of the state's witnesses was Levi Pressley, a Notary Public, who took the acknowledgment to the forged deed. Appellant contended that he was an accomplice, and the court should have so charged. The evidence clearly raised this issue, and the court was in error in refusing its submission to the jury.

**2.—Same—Jury—Misconduct of—Not Material When.**

It is shown that as the jury was leaving the court room, two of the jurors, without the permission of the court asked the assistant district attorney to inform their families that they would not be home. While improper, such conduct would not warrant a reversal.

**3.—Same—Indictment—Lost Deed—Allegations Sufficient.**

The indictment charges that the quitclaim deed, which was the alleged forged instrument, was not accessible to grand jury, and sets out what purports to be its substance. This was sufficient and the proof responded to the allegations in the indictment.

**3.—Same—Witness—Lawyer as—Privileged Matter.**

The witness Bishop was compelled to testify against the appellant. He was shown to have been appellant's attorney, even though it was not clear that he received pay for his services. The matter enquired of came to his knowledge by virtue of his relation as attorney for appellant. He claimed his privilege, and should have been sustained, and his testimony excluded. See Ruling Case Law, Vol. 24, p. 954, sec. 290 and authorities cited in the opinion.

**4.—Same—Bills of Exception—Question and Answer Form.**

There are more than eighty bills of exception in this record, the greater part of which consist of reproduction of part of the stenographer's notes in question and answer form. Such bills will not be considered by this court.

**5.—Same—Evidence—Co-conspirators—Admissible.**

In this case there was evidence of a conspiracy between several parties to forge a deed. This testimony brought into operation the rule of evidence which sanctions the use against one co-conspiraton of the relevant acts and declarations of his confederates.

**6.—Same—Jury—How Drawn.**

Improper drawing of a jury from the wheel may necessitate the reversal of cause. The manner of drawing a jury is set out in art. 5154, R. S., and by art. 5155, R. S. It is important that the statutory directions touching the manner of drawing jurors should be substantially observed. See Bell v. State, 243 S. W. Rep., 1095.

Appeal from the Criminal District Court of Tarrant County. Tried below before the Hon. Geo. E. Hosey, Judge.

Appeal from a conviction of forgery of land title; penalty, sixteen years in the penitentiary.

*Houtchens, Clark & Harrington,* for appellant.

R. K. *Hanger,* County District Attorney, J. B. *Martin,* Assistant County District Attorney, and W. H. *Tolbert,* Assistant County District Attorney, Tom *Garrard,* State's Attorney, and Grover C. *Morris* Assistant State's Attorney, for the State.

MORROW, PRESIDING JUDGE.—The offense is forgery of land title denounced by Article 947, C. C. P.; punishment fixed at confinement in the penitentiary for a period of sixteen years.

W. W. Carr had inherited a tract of land, part of which he had received from his mother and a part having come to him by the will of his father. He was the son by the second marriage of his father and had two half brothers, namely, J. S. and J. B. Carr, who were children of the first marriage of his father. W. W. Carr resided upon the land in question.

The appellant Ross Anderson and one Duncan, visited him on several occasions and he agreed to sell his land to Duncan for eighty-five dollars per acre. A deed conveying the land to Duncan was executed by Carr and his wife, and Duncan executed fifteen vendor's lien notes in payment of the land. Upon these notes at the time of their execution there was written a transfer in blank of note and lien which was signed by W. W. Carr. These papers were prepared and executed in the office of attorneys to which the appellant and the wife of Carr accompanied him, and were left with the attorneys. The money obtained by the use of these papers, or some of them, was appropriated by Mrs. Carr, Duncan and the appellant.

It is the State's theory that a conspiracy had been formed by the appellant Ross Anderson, Duncan, and the wife of W. W. Carr in order to defraud the said W. W. Carr out of his land or out of a sum of money which they would secure by mortgaging the land; that in pursuance of this design Carr was induced to join his wife in executing a deed conveying his land to Duncan and in making a blank transfer of the vendor's lien notes executed by Duncan and secured by a lien upon the land, which deed and notes were left in the possession of attorneys who represented Anderson, Duncan, and Mrs. W. W. Carr; that when it was ascertained from the attorney for the loan company who examined the title that there appeared an outstanding interest in the land in J. S. and J. B. Carr, which presented an impediment to the approval of the title they, in pursuance of the conspiracy, brought about the execution of a quitclaim deed signed by J. S. and J. B. Carr, the half-brothers of W. W. Carr, which, in

fact, was executed by Duncan and McMillan in the presence of and with the knowledge of the appellant, Ross Anderson. .

One of the witnesses who testified in behalf of the State in support of its theory was Levi Pressley. According to his testimony, he was engaged in the practice of law with an office in a building in Fort Worth, to which there came the appellant Ross Anderson, and two other men, who were introduced by the appellant as J. S. and J. B. Carr. Pressley was told by the appellant that he was making a trade upon the farm of old man W. H. Carr in Parker County; that Henry Bishop was looking after some matters for him, and that he (appellant) would pay Bishop for the acknowledgments. The witness did not know either of the men who signed the quitclaim deed in his presence. One signed J. S. Carr, the other J. B. Carr, and he took their acknowledgments to the deed. He had never seen them before but on the trial identified one of them as McMillan and the other as Duncan. After the deed was signed, and after taking the acknowledgments and putting his notarial seal upon it, he handed the deed back to the appellant. It appears from other testimony in the case that when the quitclaim deed mentioned came into the hands of the attorney for the loan company, who was to make objections to the title, appellant and McMillan went to his office and because of developments there, the deed was returned to them.

Appellant insists that the court was in error in refusing to instruct the jury on the law of accomplice testimony as relating to the witness Pressley. It is made the duty of a notary public taking acknowledgments, when he does not know the person making the acknowledgment, to require that his identity be proved upon the oath of some person with whom the notary is acquainted and that the certificate of the acknowledgment signed by the notary under his seal shall show that the signer of the instrument was made known to the notary under oath. If the certificate does not bear this statement, then the law requires that the certificate shall state that the person was known to the officer. See Article 6804, Revised Civil Statutes, 1911. In the present case, the officer manifestly made a false certificate in that he certified that the parties making the deed *were known to him as J. S. and J. B. Carr,* when, as a matter of fact, *they were not known to him.* He also failed to comply with the statute by taking the affidavit of the person introducing these parties and embracing in his certificate the statement that they were made known to him upon the oath of the appellant, Ross Anderson.

From the notary's declaration it appears that Bishop was the lawyer representing the appellant and that he was to be paid for the acknowledgment. From Bishop's testimony, as found in the record, he had been consulted by the appellant with reference to the transaction. He was also consulted in the presence of the appellant by the wife of Carr with reference to a divorce, she having separated from Carr after the

money obtained through the transaction had been divided between Anderson, Duncan and herself. Bishop also testified that he had had eight or ten conversations with the appellant about the matter and had seen in his possession a cashier's check obtained through the transaction involving the sale of the Carr land; that Duncan had also been in conference with him, and that he (Bishop) had warned the appellant against dealing with Duncan as he might get him into the penitentiary.

Taking the entire record as we find it, we are inclined to the belief that the evidence raised an issue for the solution of the jury touching the status of the witness Pressley as to whether or not he was an accomplice witness. See Preston v. State, 48 S. W. Rep., 581. It is a general rule that where one is connected with a criminal transaction and testifies to facts exculpating him, his explanation is not binding, but, taken in connection with the circumstances attending the transaction, presents a question of fact which ought, on proper request, to be submitted to the jury for solution. See Smith v. State, 89 Texas Crim. Rep., 145; Corpus Juris., Vol. 16, p. 678.

The proposition that there was misconduct of the prosecuting attorney and members of the jury which vitiates the verdict is not deemed sound. It is shown by the bill of exceptions as qualified that as the jury was leaving the court room, two of the jurors, without permission from the court, asked the Assistant District Attorney to inform the members of the families of the jurors that they would not be home. That this was the subject and extent of the conversation was proved by the jurors and by the statement of the Assistant District Attorney. We think the burden resting upon the State to show the absence of injury was met by the procedure revealed by the bill of exceptions.

The indictment charges that the quitclaim deed, which was the alleged forged instrument, was in the possession of C. A. Duncan or lost or destroyed, and was not accessible to the grand jury. The indictment sets out what purports to be the substance of the deed which gave a minute description of several tracts of land located in Parker County, Texas. The deed was not introduced in evidence, Duncan was not called as a witness, and no notice was served upon the appellant to produce the deed. However, without specific objection, it seems that there was proof by circumstantial evidence of the contents of the deed. The notary who took the acknowledgments described the instrument as a quitclaim deed purported to have been executed by J. S. and J. B. Carr, affecting "old man W. H. Carr's farm in Parker County." The deed, according to the notary, after its execution, was delivered to the appellant. From the witness Alexander it appears that he received from the Texas Surety Company an abstract for examination together with an application for loan made

by C. A. Duncan and a warranty deed from W. W. Carr and wife to C. A. Duncan, not yet recorded. After examining the title, the witness asked that an affidavit from the heirs of W. H. Carr, deceased, be furnished; also that the deed be recorded and that the $10,000.00 note described in the deed be delivered to the loan company. Afterwards, finding from the affidavit of heirship that J. S. Carr and J. B. Carr had an apparent interest in the land, he required deeds from them. The papers then in his possession were returned to him together with "a quitclaim deed signed by J. S. Carr and J. B. Carr. Levy Pressley had taken their acknowledgments." Later, Anderson and McMillan entered the office of Alexander. McMillan was introduced as Mr. Carr. The original warranty deed from Mr. and Mrs. W. W. Carr was in the possession of Alexander and had been recorded. According to his testimony, the quitclaim deed was also in his possession. McMillan gave as a reason for wanting the deed the fact that he had been advised that he had an interest in the land and did not want to deed it. Alexander said that he had an independent recollection of the description of the land but could not repeat the metes and bounds without reading from something. He said that he saw the quitclaim deed and compared it with the description in the abstract. With these circumstances and the vendor's lien notes in evidence, we think the identity of the land covered by the quitclaim deed with the deed signed by W. W. Carr became a question of fact, and the court was not in error in refusing to instruct a verdict of not guilty. If objection to the introduction of secondary evidence, as to the contents of the deed, had been made, a different question would arise.

The witness Bishop testified that he was a lawyer; that he gave advice and had had various consultations with the appellant; that he also conferred with Mrs. Carr in the presence of the appellant; that in doing so he was acting in the capacity of an attorney. In qualifying the bill complaining of the refusal to exclude Bishop's testimony, the court said that the witness testified that he had received no money for representing the appellant in any capacity as a lawyer in connection with the case. According to Bishop's testimony on the trial, the appellant exhibited to him some letters which had been received by the appellant from Mrs. Carr in which letters the appellant was referred to in endearing terms such as "honey" and "sweetheart." This occurred before the transaction in which W. W. Carr and wife made the deed to Duncan, to Carr's land and before the execution of the quitclaim deed upon which this prosecution is based. We gather from his testimony, however, that it was during the time that the appellant was consulting Bishop about the transaction mentioned with Carr. In his testimony Bishop said that he had a number of conversations with the appellant about the transactions with Duncan and

advised appellant that he (Bishop) regarded Duncan as too smart and would likely get the appellant into the penitentiary. After the deed from W. W. Carr to Duncan was executed and the money divided, we understand from the testimony that Mrs. Carr and appellant came to the office of Bishop, and that Mrs. Carr there, in the presence of the appellant, consulted Bishop with reference to a divorce proceeding against her husband. She did not employ Bishop in the divorce proceeding. According to Bishop's testimony, the appellant exhibited to him several cashier's checks which he said he had received as commission for the sale of the Carr farm. Bishop used this language: "As to whether or not I received any pay from Ross Anderson for representing him in the case, I received no money." Appellant sought, as appears from one of his bills of exception, to elicit from Bishop testimony showing that while the appellant paid him no money for his services as attorney, he compensated him by making bonds for clients of the attorney. This bill of exceptions is not in such condition as to require consideration. It is mentioned, however, in view of another trial.

The State having, in the direct testimony of Bishop, elicited the fact that the appellant had not paid him money for the advice given as an attorney, it was, in our opinion, competent for the appellant to show by Bishop in his cross-examination, that he had been otherwise compensated. By bills of exception, the propriety of receiving from Bishop testimony touching the matters revealed to him by the appellant is questioned. We entertain doubt concerning the correctness of the conclusion of the learned trial judge that the relation of attorney and client did not exist between Bishop and the appellant. We do not understand that the payment of money or the promise of payment of money is indispensable to that relationship. See Ruling Case Law, Vol. 24, p. 954, Sec. 290; Wharton's Crim. Ev., Vol. 2, p. 1030, Sec. 497, Branch's Ann. Tex. P. C., Sec. 154. That part of the testimony of the witness Bishop which purports to give the substance of the contents of certain letters which were exhibited to him by the appellant would seem admissible, independent of the nature of the relations of the parties, for the reason that it was secondary, the record revealing no effort to procure the letters or testimony showing that they were not available. The State's counsel insists that granting the relation of attorney and client existed, the testimony is rendered admissible under the rule which denies that the advice sought by one in order that he may be guided in the commission of an offense is privileged. Orman v. State, 22 Texas Crim. App. 616; Orman v. State, 24 Texas Crim. App., 504; Ott v. State, 222 S. W. Rep., 261. In developing the testimony of Bishop, the State's counsel did not go into details such as would bring the testimony within the scope of the rule invoked. As the matter is presented by the present record, we are

inclined to the view that the evidence adduced tends cogently to show that at least a part of the testimony given by Bishop was in the capacity of an attorney given while the relation of attorney and client existed with reference to the transaction in hand.

We find in the record more than eighty bills of exception. For the greater part, these bills consist in the reproduction of part of the stenographer's notes in question and answer form. They are, moreover, incomplete in failing to embrace any of the attending facts or give the circumstances under which the rulings complained of were made.

Without discussing the subject in detail, the opinion is expressed that there was evidence of a conspiracy in which Anderson, Duncan, Mrs. Carr and McMillan were parties as brought into operation the rule of evidence which sanctions the use against one co-conspirator of the relevant acts and declarations of his confederates. This rule will be found stated in many of the decisions of this court. Among them are Cox v. State, 8 Texas Crim. App., 256; Willey v. State, 22 Texas Crim. App., 408; Ency. of Law & Proc., Vol. 8, p. 680. The rule may be thus stated:

"If two or more act together, with unlawful intent, in the perpetration of a crime, they are co-conspirators and principal offenders by reason of their common design and co-operation, and, whether they be tried or indicted jointly or separately, the antecedent acts or declarations of each, pending and in pursuance of the common design, and tending to throw light upon its execution or upon the motive or intent of its perpetrators, are competent evidence against each and all of them." (Cox v. State, 8 Texas Crim. App., 256.)

Under this rule, or the rule of *res gestae*, or as showing motive and intent, all of the testimony introduced by the State and against which objection was urged was relevant, though some of it, such as secondary evidence of letters and privileged communications between attorney and client, may have been inadmissible under other rules of evidence. It seems that counsel for the appellant proceeded upon the theory that nothing was admissible against his client except the bare fact that he had taken part in the forgery, and the receipt of practically all the other testimony was made the subject of objection.

It appears from the record that in drawing the jury for the week, the provisions of the statute, Arts. 5151 to 5158 R. S., and Arts. 426 to 434, Vernon's Texas P. C., were in some respects not observed. It seems that in drawing the names of the jurors from the wheel, instead of taking them one by one as the statute directs (Art. 5154 R. S.) and listing them seriatim as directed by Art. 5155 R. S., there were taken out in bulk about one thousand cards containing the names of eligible jurors and divided into stacks of two hundred and twenty-five each, corresponding in number to two weeks of the court. In this

condition they were taken by the clerk to his office and a list made without any attention to the order in which the cards were drawn from the wheel. This matter is mentioned because it is deemed important that the statutory directions touching the manner of drawing jurors should be substantially observed. The non-observance of similar statutory provisions with reference to drawing a jury has on occasions made it necessary to reverse judgments of conviction. See Bell v. State, 243 S. W. Rep., 1095.

For the errors pointed out, the judgment is reversed and the cause. remanded.

*Reversed and remanded.*