## PAUL D. COLE v. STATE.

No. A-7993.  Opinion Filed April 25, 1931.
(298 Pac. 892.)

Billingsley & Stanley and Freeling & Box, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State

CHAPPELL, J.   Plaintiff in error, hereinafter called defendant, was convicted in the district court of Seminole county of the crime of murder, and his punishment fixed by the jury at death.

The state charged that on the 24th day of March, 1930, the defendant and one Frank Hunt murdered Ernest Irby. A severance was taken, and Cole was tried first.  Hunt afterward pleaded guilty, and his punishment was fixed at imprisonment in the state penitentiary for the term

of his natural life. In the trial of the case at bar, Hunt turned state's evidence and told a complete story of the cause, the motive, the steps taken, and the circumstances surrounding the commission of the crime.

The evidence of the state was that in the latter part of March, 1930, there was pending in the United States District Court for the Eastern District of Oklahoma a prosecution against the defendant, the deceased, and one Tom Woods, in which they were charged with conspiracy to violate the federal prohibitory laws. The deceased and Woods had made sworn statements to the federal officers acknowledging their guilt of the crime and implicating the defendant therein. The evidence of the state was that this killing was the outgrowth of the prosecution in the federal court, and that the motive for the taking of deceased's life was the desire on the part of the defendant to get rid of deceased as a witness against him in the federal case.

The witness Hunt testified that he was a lawyer located in Tulsa; that he met the defendant in the fall of 1929; that they became intimately acquainted and bosom associates; that defendant told Hunt about the indictment in the federal court and that he was promised a position with the Sun-Ray Oil Company that would make him $18,000 or $20,000 a year, but he could not get the position until he got out of the trouble that he was in in the federal court; that, knowing Hunt was a lawyer, he consulted with him about how to get rid of the case in the federal court; that defendant borrowed $400 and Hunt and defendant went to see Irby and Woods and tried to persuade them to change their testimony or to leave the state; that they went to Shawnee and consulted Park Wyatt, an attorney there, upon the question of what effect it would have on their case if deceased and Woods failed

to appear; that defendant and Hunt went to Wewoka and saw Irby, and he refused to change his testimony or to leave the country; that they thereupon decided to kill him; that they induced the deceased to go with them to Lake Wewoka, where they shot and killed him; that, after shooting him, they wired a heavy piece of pipe to the body and towed it out into the middle of the lake and sunk it; that after deceased disappeared from his home on the evening of March 24, 1930, in company with the defendant, and upon his failure to show up the next day, the wife of deceased got into communication with defendant and was informed that the deceased had gone to Arizona, and would return some time in the future; that he was all right and for them not to worry about it; that, at the time this conversation was had with Mrs. Irby, the deceased had been murdered and his body sunk in Lake Wewoka; that after the homicide was committed they went back to Shawnee, and there called Attorney Wyatt over the phone in order to establish their alibi; that they went back to Wewoka the next day and from there to Okmulgee, where the case in the federal court was continued as to defendant because of the failure of deceased to appear against him; that on the 10th day of April, 1930, the caretaker at Lake Wewoka, in Seminole county, discovered floating in said lake the body of a man in an upright position, with one arm waving in the breeze; this caretaker took a boat and went out into the middle of the lake and towed the body in, and then notified the officers; that this body was afterwards identified as the body of Ernest Irby, the deceased, who had been engaged in the drug business in the city of Wewoka, and who had disappeared from that city in company with defendant about 17 days prior thereto; that an examination of the body revealed that deceased had been shot in the head prior to the sinking of the body in Lake Wewoka; that de-

fendant and Hunt were arrested soon after the discovery of the body.

Defendant admits having a conversation with the wife of deceased and telling her that her husband was in Arizona, but said he did so because Hunt had told him the deceased had gone to Arizona. The defendant, testifying for himself in the trial, admitted practically everything that Hunt testified to as to their various whereabouts, the consultation with Attorney Wyatt, and other things as to which Hunt was corroborated, but denied that he had anything to do with the procuring of the pistol, the shooting of the deceased, or the sinking of his body in Lake Wewoka. Defendant testified that on the evening of March 24, 1930, he left Hunt with the deceased in the city of Shawnee, Okla., giving Hunt $300 with which to send Irby out of the state, and that defendant then went on to Oklahoma City and stayed at the Lawrence Hotel the night of March 24th; that later he met Hunt, who told him that Irby had gone to Arizona; that Hunt had given the $300 that defendant had given him to Irby; that the first he knew that Irby was dead was on the 10th day of April, when Hunt read to him an account of the discovery of the body while they were in a room in a hotel.

Defendant contends, first, that the trial court erred in admitting incompetent, irrelevant, and immaterial testimony which tended to show that the defendant was guilty of separate crimes disconnected with the crime for which he was being tried.

It is earnestly contended that the evidence of the indictment of the defendant in the federal court and of the circumstances surrounding this indictment were inadmissible, for the reason that such evidence tends to establish other crimes independent of the one upon which defendant was being tried.

The state contends that the admission of evidence of other offenses was proper in this case because the evidence tending to show the guilt of the defendant of other offenses also tends to show the motive for the commission of the homicide, that this offense was directly the outgrowth of the fact that defendant had committed the other offenses testified to, and that at that time he stood charged with its commission in the federal court of the Eastern district of Oklahoma.

As a general rule, evidence of other offenses is not admissible for the purpose of showing that the defendant is guilty of the particular offense charged. But to this general rule there are certain well-settled exceptions. One of these exceptions is that evidence of another offense is relevant and admissible when it tends to prove some element of the offense charged, as when it tends to show guilty intent or motive of the offense charged. Smith v. State, 3 Okla. Cr. 629, 108 Pac. 418; State v. Rule, 11 Okla. Cr. 237, 144 Pac. 807.

In Dumas v. State, 19 Okla. Cr. 413, 201 Pac. 820, this court said: "It is a general rule in criminal prosecutions that evidence of any offense other than that for which the prosecution is had is inadmissible. To this rule there are exceptions, and one of them is that evidence which tends to show motive or intent may be given against a defendant, although its introduction may involve defendant in the commission of other offenses." See, also, Wise v. State, 34 Okla. Cr. 284, 246 Pac. 656; Johnson v. State, 35 Okla. Cr. 212, 249 Pac. 971; Jackson v. State, 42 Okla. Cr. 86, 274 Pac. 696.

In the case at bar the motive for the commission of the homicide grew out of the collateral crime itself. The homicide could not have been clearly understood by the

jury unless they were permitted to know the real motive the defendant had for its commission. Therefore the evidence of defendant's probable guilt of the other crime and the fact that there was a prosecution pending against him for its alleged commission, came within the well-grounded exception to the general rule that evidence of other offenses is not permissible in order to prove the particular offense charged.

The trial court therefore did not err in admitting the evidence of this collateral offense.

Defendant next contends that the trial court erred in permitting Mr. Park Wyatt, an attorney, to testify to certain confidential communications made by this defendant to him in his capacity as an attorney for the defendant, and which conversations were permitted to be detailed without the consent of this defendant.

The state contends that the communications testified to were not privileged, for the reason that they concerned the proposed commission of a crime, in the future, by this defendant as a client, and did not relate to a past transaction.

When the witness Wyatt was first called to the stand, objection was made to any testimony on the ground that the confidential relation of client and counsel existed, and that said evidence was therefore inadmissible. After some consultation and private examination by the court, the court said:

"Well, I will only allow such testimony in relation to future crimes, and not any testimony in relation to past offenses. Do not ask anything about the federal court case. Just ask him whether or not he was consulted in relation to future offenses. The law is pretty plain on that. Tell the jury to come in."

Thereupon the witness Wyatt testified:

"Q. Did you have any conversation with Paul Cole and Frank Hunt on the 19th of March, 1930? A. Yes, sir.

"Q. Whom did you talk to, Mr. Wyatt, or did you talk to both of them together at the same time? A. Oh, I think Mr. Hunt came into my private office first and said a few words, and then Mr. Cole came there with him.

"Q. Mr. Cole came in with him? A. Yes, sir; the conversation that we had, all three of us were present.

"Q. Did defendant talk to you in relation to the commission of some future crime? A. Let me advise you privately first before I answer the question. (Whereupon court and counsel hold a private conversation between themselves out of the hearing of the jury.) A. In the closing of the conversation he asked me what would be the effect on a certain case he had pending if a certain witness was out of the way.

"The Court: Q. What did he tell you? A. Tom Woods and Ernest Irby.

"Q. Was that before or after the death of Ernest Irby? A. That was before the death of Ernest Irby.

"Mr. Bishop: Q. Mr. Wyatt, in the general conversation that you had with the defendant, Paul Cole, and Frank Hunt, state whether or not they told you why, for what reason it was necessary to get these witnesses out of the way to beat the case in the federal court? A. Yes, sir.

"Q. What was the statement made with reference to why it was necessary to get the witnesses out of the way to beat their case in the federal court? A. Mr. Cole said that he had a job offered him with the Sun Ray Oil Company at the salary of $18,000 a year and that he had to get rid of this matter before he could go to work for the Sun Ray Oil Company, that Frank Hunt would have a job with him. That was the substance of the conversation.

"Q. At the time they asked you what would be the effect on the case in the federal court if Ernest Irby and Tom Woods were gotten out of the way, what did you tell them? A. I told them that that was a matter I didn't want to discuss, but that if that was the only witness against Cole it would probably end the litigation against them. That if they persisted in that line of endeavor they would be in a worse predicament than they would be over a bootlegger case and would be up against it for obstructing justice in the federal court.

"Q. What was said in that subsequent conversation about moving or transporting either Ernest Irby or Tom Woods to any place? A. The last conversation, I think it was on the morning of the 24th of March, 1930, to the effect that Tom Woods—Tom Woods had agreed to take the rap, that was the statement. And that Ernest Irby had agreed to get out of the way and stay out of the way. And they told me in one other conversation that Ernest Irby had gone. They never did tell me where he had gone to, or where he was going or where he agreed to go."

Section 589, C. O. S. 1921, provides:

"The following persons shall be incompetent to testify: * * *

"Fourth: An attorney, concerning any communications made to him by his client, in that relation, or his advice thereon, without the client's consent."

In the case of Morris v. State, 6 Okla. Cr. 29, 115 Pac. 1030, this court had under consideration the precise question involved in this case, and there said:

"Professional communications between a lawyer and his client are not privileged, when such communications are had for the purpose of being guided or assisted in the commission of a crime."

The great weight of authority is that, where the consultation is concerning a crime to be committed in the

future, the communication is not privileged, and the attorney may testify thereto.

Wigmore on Evidence, vol. 4, page 3216, § 2298, states the rule thus:

"It has been agreed from the beginning that the privilege cannot avail to protect a client in concerting with the attorney a crime or other evil enterprise; and for the logically sufficient reason that no such enterprise falls within the just scope of the relation between a legal adviser and his client."

In 28 R. C. L. page 568, § 158, the rule is stated:

"It is well settled that in order that a communication between a lawyer and his client may be privileged, it must be for a lawful purpose, or in furtherance of a lawful end. Accordingly, communications made to counsel prior to the commission of a crime which is contemplated by the so-called client, and in reference to the perpetration thereof, or for the purpose of being guided or assisted therein, are in no sense privileged and the attorney may testify thereto."

See, also, Standard Fire Ins. Co. v. Smithhart, 183 Ky. 679, 211 S. W. 441, 5 A. L. R. 972; Commonwealth v. Dyer, 243 Mass. 472, 138 N. E. 296; Dyer v. Commonwealth of Massachusetts, 262 U. S. 751, 43 S. Ct. 700, 67 L. Ed. 1214; Lockhart v. Washington Gold & Silver Mining Co., 16 N. M. 223, 117 Pac. 833; Ott. v. State, 87 Tex. Cr. R. 382, 222 S. W. 261; State v. Richards, 97 Wash. 587, 167 Pac. 47; In re McDonough, 170 Cal. 230, 149 Pac. 566, L. R. A. 1916C, 593, Ann. Cas. 1916E, 327; Gebhardt v. United Rys. Co. of St. Louis (Mo. Sup.) 220 S. W. 677, 9 A. L. R. 1076; Anderson v. State, 98 Tex. Cr. R. 449, 266 S. W. 159; In re Elliott, 73 Kan. 151, 84 Pac. 750.

The trial court properly excluded the evidence of the attorney concerning the indictment for liquor conspiracy pending in the federal court and limited the testimony to

the other transaction, which was the commission of the crime charged in the case at bar. It was not error, therefore, for the trial court to admit such evidence.

Defendant next complains that the court erred in refusing and ruling out legal evidence on the part of the plaintiff in error.

A careful examination of the record discloses that the defendant made no offer to prove what the answer of the witness would have been. Where objection is sustained to the evidence offered, the party complaining should dictate into the record what he expects to prove by the answer of the witness. Where this is not done, this court is unable to tell whether the evidence is competent or incompetent. Levine v. State, 50 Okla. Cr. 157, 296 Pac. 758.

It appears from the form of the question that everything which the question purported was subsequently got before the jury, so that the defendant was not prejudiced or injured by the ruling of the court.

The evidence of the state established one of the most cold-blooded murders in the annals of criminal jurisprudence, a murder deliberately planned and systematically and cold-bloodedly executed. The punishment of death fixed by the jury is overwhelmingly supported by the evidence and duly merited by the defendant.

For the reasons stated, the cause is affirmed. The original time for the execution having passed, owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Seminole county be carried out by the electrocution of the defendant on the 10th day of July, 1931.

DAVENPORT, P. J., and EDWARDS, J., concur.